### THE BELLINGHAM. THE DODE. THE FLYER.

(District Court, W. D. Washington, N. D.   June 7, 1905.)

#### Nos. 2,610, 2,604.

1. COLLISION—STEAMERS CROSSING IN SEATTLE HARBOR IN FOG—EXCESSIVE SPEED AND NEGLIGENT NAVIGATION.

The steamboat Bellingham, with a tow alongside, left the docks at Seattle in the morning in a dense fog, and, after two or three stops, straightened out on a course to the northwest. At about the same time the Flyer, a fast passenger steamboat, making four regular trips daily to Tacoma and return, left the docks further to the north, and took her usual course to the southwest, attaining a speed of not less than 10 miles an hour in 3 minutes, when a collision occurred between her and the Bel-

lingham and tow, which struck her on the port side with great force. Both vessels were sounding fog signals, but when they first saw each other the Bellingham was about 85 feet from the point of collision, making a speed of 3 knots or more, and the Flyer was about 140 feet from the same point. The master of the Bellingham knew the position of the Flyer's slip, her time of departure, and her usual course across the bay, and also heard her whistle for starting. *Held*, that both vessels were in fault—the Flyer for excessive speed in a fog in a bay where there were other vessels moving and anchored, and the Bellingham for failing to take warning of the Flyer's approach and to wait for her passage before approaching her course; that the Flyer was liable for one half the damages, and the Bellingham and her tow (which belonged to the same owner) for the other half, including damages for injury to an anchored vessel which was struck by the Flyer in consequence of the collision.

[Ed. Note.—Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532].

**2. SAME—EXCESSIVE SPEED—RULES APPLICABLE TO REGULAR PASSENGER STEAMERS.**

The law makes no exception in favor of passenger steamers running regularly on schedule time on an established route, and, for injuries resulting from excessive speed in violation of the rules prescribed to insure safety to vessels and passengers, they must render compensation to the injured.

In Admiralty. Counter-suits for damages on account of collision. Decision on the merits, and decree for a division of damages.

E. M. Carr, for owner of the Flyer.

Charles F. Munday, for owner of the Bellingham and the Dode.

HANFORD, District Judge. The proctors for the respective parties have taken extraordinary pains in the preparation and argument of these cases. The arguments, both oral and written, were very able and complete in discussing all the minute details of the testimony, and the propositions of law contended for. They have not, however, succeeded in obscuring or in excusing the mutual faults, which appear to be glaring, in the light of the testimony of every important witness. The simple facts are that on a foggy morning the steamboat Bellingham (having the steamboat Dode in tow) and the steamboat Flyer started to make their way out of Seattle Harbor on crossing courses, and a collision happened, by which all three of the steamers and the ship Chili, which was moored to a buoy in the harbor, were injured. For convenience, the Bellingham and the Dode will be hereafter referred to as if they were one vessel, as they were lashed together and commanded by one captain, and the Dode was without independent motive power. The Bellingham was the first to get away. Leaving her berth at the Colman Dock, she proceeded to where the Dode was moored, on the north side of Pier C, which is south of the Colman Dock. Then, with the Dode secured by three lines on her starboard side, the Bellingham backed out into the harbor sufficiently to clear the dock in making the turn necessary to come around on her course out of the harbor, which was west by north, her destination being Bellingham. The fog was very dense at the time, so that objects could not be seen at a greater distance than about 200 feet. After backing sufficiently to get away from the dock, she made a horse-

shoe curve partly around the revenue cutter Manning, which was anchored at the place indicated upon the annexed outline map of the harbor:

A period of from 10 to 12 minutes elapsed while the Bellingham was executing her movements in backing and curving after hooking on to the Dode, and before the collision occurred. This consumption of time is accounted for by the fact that she made three full stops after having started her engine to working ahead, and while the Manning was visible from her pilot house. During this time diligent use was made of her whistle, giving the blasts required to be given in foggy weather by a steamer burdened with a tow. When the Flyer came into view, the Bellingham had completed her curve, and was headed on her own course, and at right angles to

the Flyer's habitual track, and not a greater distance from it than 85 feet, and the Flyer was proximately 170 feet distant from her starboard bow. The Bellingham is 137 feet in length, and the Flyer 171.11 feet, so that each vessel had less than her own length of distance from her stem to the point where their paths crossed. At that moment the captain of the Bellingham was signaling to his engineer for full speed ahead, but before the order could be executed it was changed, and the proper signal given to reverse and work the engine full speed astern, and several blasts of the whistle were given as a warning of danger. The engineer acted promptly in obeying the order to reverse, and the engine was working full speed astern when the collision occurred.

The Flyer is a passenger steamer, and a fast one, making at full speed 18 knots an hour; but she responds to her helm slowly, and for that reason is obliged to make a long curve to get on her course out of the harbor after backing away from her berth at the dock. She has for many years made four round trips per day on her regular run between Seattle and Tacoma, and maintained a reputation for punctuality on her schedule time, regardless of fogs and all hindrances, and on this occasion all her movements were executed with her habitual celerity. Her regular time for departure on her first trip was 7:30 a. m. Pursuant to her invariable custom, notice of her intended departure was given by the blowing of her whistle at 7:15, and repeated at 7:25. At 7:32 her lines were cast off, and she commenced to back out, and at the same time gave a short toot of her whistle. She backed away to the northward until she was about opposite Pier No. 5. At 7:35 her engine was reversed, and she started ahead on a port helm, curving to starboard sufficiently to give good clearance to the Manning on her port side. As she went ahead in the fog, the required signals were given by blasts of her whistle at short intervals. Her captain heard and noted the signals given by the whistle of the Bellingham, which indicated her position to the southward, and he erroneously assumed that she was making towards a landing at some point further southward. This error can be easily accounted for by the fact that the first whistle noted was given when the Bellingham was at the northern extremity of her backward movement, and when the Flyer was backing to the northward, and the next whistle was heard when the Flyer was still backing, and the Bellingham was working ahead, so that the distance between the two vessels had increased during that interval. Having in this manner mentally disposed of the Bellingham, the captain gave no further heed to her movements until she became visible, which was probably at the moment when her captain commenced to give an alarm upon discovering the position of the Flyer. No effort was made to check the speed of the Flyer when the danger of a collision was imminent, but I do not hold this to be an error, for the reason that her captain judged rightly that the only possible chance which she then had to escape was by maintaining her speed, and running past the point where the courses of the two vessels crossed before the Bellingham could reach it. I am convinced that, with her speed, the Flyer would have passed

unharmed if the Bellingham's rate of speed at that time had been less than three miles an hour. The testimony introduced in behalf of the Bellingham justifies the conclusion that her travel ahead after discovering the Flyer did not exceed 85 feet. The distance from the Flyer's stem when she was discovered by the captain of the Bellingham to the point where the lines intersected was not greater than 140 feet, and that distance plus her length is the travel required of the Flyer to have passed clear. She stopped backing, and started ahead at 7:35, the collision occurred at 7:38, and in the intervening 3 minutes she traversed a distance of at least half a mile, so that she had developed a speed of something more than 10 miles an hour. According to the excellent table for calculating speed and distances annexed to the brief furnished me by the proctor for the Bellingham, the Flyer, at the rate of 10 knots an hour, should have made the required distance of 311 feet necessary to have crossed ahead of the Bellingham in a fraction less than 19 seconds, and the Bellingham, going at the rate of 2½ knots, would have traveled but 80.18 feet in the same time, and, if she had been going at the rate of 3 knots, the reversing of the engine should have checked her speed in time to have enabled the Flyer to pass clear; but the fact is that the Dode and the Bellingham both rammed the port side of the Flyer at a point 110 feet abaft of her stem. Therefore the actual travel of the Flyer was only 250 feet, which, according to the table referred to, at her rate of speed, should have been made in the number of seconds required for the Bellingham to go 75 feet at the rate of 3½ knots. Considering the force with which the Flyer was struck, the Bellingham's speed could not have been less than 3 knots; and if her travel was less than 85 feet, and the Flyer's travel correspondingly greater than 140 feet, the three vessels would have bumped noses, instead of the Flyer being struck on her side abaft of amidships. In reaching my conclusion with reference to the position of the different vessels at the moment when they became visible from each other, and the speed of each, I give credence to the testimony of the captain of the Flyer to the effect that when he first saw the other vessels they seemed to be headed towards his pilot house, and the line of his vision ranged between their two smokestacks, which proves that the Flyer's position then was very little to the eastward of the colliding vessels. Both the Dode and the Bellingham rammed the Flyer with great force, cutting deeply into her hull, and caused her to swing to port, and in consequence of that deflection from her course she ran into the ship Chili, which was moored to a buoy a short distance from the place of the collision, doing serious damage to that vessel, for which the libelant was obliged to pay damages.

The fault of the Flyer in violating the law by running at a rate of speed of 10 knots in foggy weather across a harbor in which vessels were anchored and moored to buoys, and others were in motion, is so obvious and inexcusable that I deem it unnecessary to make further comment upon her management. In her behalf it has been urged that, for the convenience of the traveling public, it is necessary for a passenger steamer to meet her appointments

with punctuality and regularity. But the law makes no exception in favor of passenger steamers running regularly on schedule time on an established route, and for injuries resulting from their violations of the laws prescribed to insure safety to vessels and passengers they must render compensation to the injured.

The captain of the Bellingham knew the Flyer's time of departure, and her track across the harbor, and her habits; and he was warned by the blowing of her whistle, which he also knew, of her intended departure before he ventured out into the fog, and of her approach before he turned to cross her path with the vessels under his charge, and he could have avoided the collision. To have kept out of danger, it was only necessary for the Bellingham to have prolonged her third stop one minute to let the Flyer pass. She was then in a safe position to the southward of the Flyer's track, she was not groping to find her position in the fog, for the Manning was in sight on her starboard side, and there were no conditions existing to cause serious inconvenience by waiting for the Flyer to pass. The Flyer had no superior claim to the right of way, but, on the other hand, she was not an overtaking vessel, and heed should have been given to her fog signals indicating her approach on a course crossing the Bellingham's course; but the testimony of the captain of the Bellingham and all the circumstances of the case prove that he gave no heed to the Flyer, and that he disobeyed the law by unnecessarily going ahead into known danger. I do not assent to the proposition advanced in behalf of the Flyer, that she is to be regarded as a ferryboat making regular trips across the harbor, and for that reason entitled to peculiar privileges. But I am disposed to make a practical application of a familiar rule strongly urged upon my attention by the proctors for both parties, viz., every boat should be navigated cautiously in foggy weather, and their movements should be governed with respect to all the conditions known to exist. The collision between the three steamers and also the collision between the Flyer and the Chili were consequences of mutual faults, and the case is one for a division of damages. The Flyer must be held liable for one-half of the aggregate amount, and the Bellingham and the Dode together liable for one-half, including the amount paid in settlement for the injury done to the Chili.

The damages proved and allowed by the court are as follows:

| | |
|---|---:|
| The Flyer's expenses for repairs | $3,313 46 |
| Demurrage for nine days' detention of the Flyer at $100 per day, including wages of her crew | 900 00 |
| The amount paid in settlement for damages to the Chili | 375 00 |
| The Dode's expenses for repairs | 905 73 |
| The Bellingham's expenses for repairs | 295 17 |
| Demurrage for five days' detention of the Bellingham at $50 per day, including wages of her crew | 250 00 |

The total damages amount to $6,039.36, and I direct that a decree be entered in favor of the Columbia River & Puget Sound Navigation Company for the amount of the difference between one-half of said total and the aggregate of the last three items. Each party may tax costs, and the total will also be divided equally.