THE PASSAIC.

(District Court, E. D. New York. August 3, 1911.)

1. COMMERCE (§ 25*)—EMPLOYER'S LIABILITY ACT—EMPLOYÉS ON FERRYBOAT.
   Employer's Liability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), as amended by Act April 5, 1910, c. 143, 36 Stat. 291, applies to employés of a railroad company employed on a ferryboat owned and operated by the company in interstate commerce in connection with its railroad, superseding state statutes on the subject.
   [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 25.*
   What law governs master's liability for injuries to servant, see note to Mexican Cent. Ry. Co. v. Jones, 48 C. C. A. 232.]

2. SEAMEN (§ 29*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—NEGLIGENCE.
   Evidence considered in a proceeding on a claim for the death of an oiler employed on a steam ferryboat, caused by steam escaping from the main steam pipe which broke off at the joint where it was attached to the steam chest, and *held* not to show any act of negligence on the part of the owner of the vessel which rendered it liable, but to leave the cause of the breaking of the pipe entirely unexplained and to be conjectured only.
   [Ed. Note.—For other cases, see Seamen, Dec. Dig. § 29.*]

3. SHIPPING (§ 209*)—LIABILITY OF VESSEL OWNER—PROCEEDINGS FOR LIMITATION.
   In order to avail himself of the statute allowing a limitation of liability, a vessel owner must surrender the vessel for sale within a reasonable time after the claim arose, and in as good condition as at that time, and, if he retains and uses it for any considerable time and until

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

It has from any cause greatly deteriorated in value, he cannot limit his liability to the amount it brings at the sale, but a claimant on seasonable objection may show the market value of the vessel at the time the claim arose.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 646–662; Dec. Dig. § 209.*]

4. SHIPPING (§ 209*)—EMPLOYER'S LIABILITY ACT—ADMIRALTY JURISDICTION —PROCEEDING FOR LIMITATION OF LIABILITY.

Whether or not Employer's Liability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), by implication repeals the statutory provisions permitting shipowners to limit their liability in so far as they might be used by a railroad company engaged in interstate commerce to limit its liability for injuries to employés on its vessels used in such commerce, it does not deprive a court of admiralty of the general jurisdiction over limitation of liability because such a claim is involved, nor of jurisdiction to hear and determine a claim on its merits therein with the consent of the claimant, or where the proceeding was begun before the passage of the statute and where any objection to jurisdiction on such ground had been waived.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 209.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

In Admiralty. Suit by the Erie Railroad Company, as owner of the steam ferryboat Passaic, for limitations of liability. On claim for damages for the death of an employé. Decree for petitioner.

Wilcox & Green (Stetson, Jennings & Russell, of counsel), for petitioner.

Roy, Watson & Naumer (Robert H. Roy, of counsel), for claimant.

CHATFIELD, District Judge. [1] This is a proceeding on the part of the owners of the ferryboat Passaic to limit their liability under section 4283, R. S. (U. S. Comp. St. 1901, p. 2943), for claims existing against the ferryboat prior to the 26th day of April, 1910, on which their petition was filed. A sale of the boat was had and the proceeds deposited. But one claimant has filed a claim. This claimant is the personal representative of one Wilson, who was almost instantly killed upon the morning of October 20, 1908, by the escape of steam into the fireroom of the Passaic, just after she had left her slip on the Jersey side and was straightening into her course across the Hudson river. She was then within the state of New York, and such a claim would arise under section 1902 of the Code of New York. But this statute has been superseded and a broader right in interstate matters has been given by the Act of April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), as amended by the Law of April 5, 1910, c. 143, 36 Stat. 291. Fulgham v. Midland Valley R. Co. (C. C.) 167 Fed. 660. The statute allowing the limitation of liability is hence applicable thereto. Butler v. Boston Steamship Co., 130 U. S. 555, 9 Sup. Ct. 612, 32 L. Ed. 1017.

[2] The ferryboat had a considerable load of trucks, heavy with cans of milk. Care was paid to the distribution of the load, as the Passaic was not a large boat and her displacement was materially affected by each loaded four-horse milk truck. Wilson was an oiler at the

time, and was alone in the part of the engine room where the accident occurred. The main steam pipe from the boilers to the engine, after being carried upon hangers for a considerable distance under the frame of the vessel, makes a right-angle turn to connect with the butterfly throttle valve at the steam chest. One of the flanges fastening the valve to the steam chest broke from the main portion of the valve, showing a clean fracture entirely around the end of the pipe. The position of the pipe after the accident was shown upon the trial. The remainder of the valve and the short arm of the elbow were upheld by the throttle lever running from the valve to the floor of the engine room above, while the bend of the elbow itself turned down as far as the steam pipe could sag; the nearest hanger being drawn out from the timbers of the deck to which it was suspended, thus allowing some movement or play to the elbow when freed from the counterbalance of the pipe into the steam chest.

The testimony upon the trial indicated sufficiently that the hanger was drawn out by whatever force caused the fracture. There was no evidence and no physical fact shown from which to conclude that the weight of the pipe, or any violence, tore out the hanger *before* the fracture, or that the weight of the pipe alone caused any change in the position of the hangers, except at the time of the break itself. There was no evidence of an explosion or bursting, in the sense of a blowing out from the interior of the steam pipe, and the escape of steam was shown by the testimony to have come through the open end of the pipe after the fracture. The pipe itself showed no flaw, except that it had not been cast in such a way as to secure concentric registration of the outer and inner circumferences; that is, one side of the pipe was somewhat thinner than the other at the break. But the thinnest part of the steam pipe was thicker than the minimum requirements of the United States regulations covering the use of a steam pipe for the pressure and situation specified. Upon the morning in question the steam pressure was well below the amount allowed upon an inspection but a short time before by the government inspectors.

Under these circumstances no testimony was presented from which negligence could be inferred, because no testimony suggesting a reason for the accident was furnished, beyond the fact that the death resulted from the escaping steam, and that the escaping steam came from the fractured pipe, and that the fracture was the result of a strain, either external (that is, by the application of some force to the pipe itself), or internal (by a sudden impact of steam). Any physical explanation of the accident from defect in construction or handling is impossible on the evidence.

The representatives of the deceased have offered no evidence showing any improper use of the machinery or engines from which the conclusion could be drawn that a sudden application of steam occurred, so that no negligence in that way, nor in the management of the engine itself, has been proven.

The personal representative of the deceased has attempted to show that this particular ferryboat was old, and that her deck timbers sagged and gave under the passage or continued weight of a heavy milk

wagon. But the testimony as to the structure of the boat and the plan of her timbering, which was integral with the keel and which would not allow of sagging unless it affected the entire hull, removes the possibility of concluding that the deck timbers from which the steam pipe was suspended could have sagged to such an extent as to break the pipe in question, especially as they were found afterward to be sound, and no possibility of deviation from the horizontal was located at the spot in question.

The testimony as to the displacement of the boat in the water, or as to the creaking or bending of the plank flooring of the deck, was not traced in any way to a resultant movement of the deck timbers; and, in the absence of a giving way or change in position of these timbers, it is impossible to conclude that any strain could be communicated to the steam pipe by means of the hangers, sufficient to cause the break in question. In this regard it must be remembered that the break was inside of the engine room space, and that the pipe was suspended under the deck timbers forming the side of the engine room space at the inner side of one of the horse-gangways. A strain caused by displacement, sufficient to break the pipe at the flange, would have had to be transmitted by the pipe itself, and, taking into account the elasticity of the timbering, the hangers, and the pipe (even if the structure was substantially rigid), it is evident that a displacement sufficient to break the pipe at a point distant some feet from the application of the strain causing the displacement of the parts would have been so great as to leave some evidence other than the fracture of the steam pipe and the pulling out of the hangers.

It will be seen that, as the hangers were rigid, they could not have been pulled out by transmitting the strain, but would have remained in the same position after the strain had been relieved by the breaking of the pipe.

It follows, therefore, that no negligence on the part of the company has been shown, and the accident would seem to have occurred from some unascertainable, and hence unavoidable, violent movement of the machinery or pipe (and no suggestion of cause for this can be found in the record), or that a sudden pressure of the steam in the pipe in question broke the pipe at the weakest point, namely, the point of joining the flange with the valve, and that no exercise of care (for which the railroad company or its agents were responsible) could have avoided or anticipated the occurrence.

[3] The decedent's representative was notified of the proceedings to confirm the sale and did not oppose confirmation. He thereby consented to the substitution of the fund for the boat, and consented to the proceeding to limit liability in so far as the release of the boat from the lien was accomplished thereby. It has now been suggested, and some evidence has been produced to indicate, that the boat in question was worth more at the time of the accident and of bringing claim because of the accident, than at the time of the sale; and it must be held that, under the statute allowing limitation of liability, the petitioner must at the end of the voyage, or if there be no voyage within a reasonable time, offer the boat as she is. A petitioner may not keep the

boat and elect to retain her for his own benefit, rather than to turn her over to the court for sale, and after some time, if a claim arises, yield up a boat greatly deteriorated in value or even partially destroyed, in place of what was subject to the claims at the time those claims arose. In the present instance the decedent's representative brought suit in the state court, and it was not until some 18 months after the accident, and after, as has been shown by the testimony, ferryboats were not so useful to the railroad company (because the opening of tunnels under the Hudson river had materially diminished the use of such boats), that the company surrendered the boat to the court for sale.

Under these circumstances it must be held that the decedent's representative has a right to show that the ferryboat was worth more at the time the claim attached, and that the petitioner, in a proceeding to limit liability, cannot evade personal liability to the amount of the boat's value at that time, by a surrender of the boat at a much later time. Acquiescence on the part of the various parties to the sale of the boat estopped them from questioning the amount brought at the sale. Their appearance and failure to object to the deposit of funds and to the call for proof of claims would estop them from opposing the release of the petitioners under the limitation statute, and the objection that the value of the boat had diminished would have to be seasonably taken. In the present case this objection seems to have been raised, but the evidence that the boat could have been sold for more than she brought at the time of sale is so vague as to be insufficient upon which to fix a greater value.

One of the petitioner's own witnesses testified that in his opinion the boat could have been sold for use as a barge (inasmuch as she was made of wood and the later ferryboats had steel or iron hulls) for a price nearly double what the boat did bring upon the sale. But his testimony seems to have been given under the impression that, at the time of sale, she ought to have brought just as much for this same purpose. Inasmuch as she did not sell for more, as the sale seems to have been fairly conducted, and as its confirmation was not opposed, this estimate of value cannot bind the railroad company and must be held to be mere opinion.

The result, therefore, is that the petitioning company would seem to have a right to limit its liability to the fund in question, and that the only claimant, namely, the decedent's representative, has not succeeded in sustaining the burden of proof in showing any negligence from which the company could be held responsible for the decedent's injuries.

[4] But one point remains. It has been urged that the law known as the United States employer's liability law (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1909, p. 1171]) is general in its application, and applies to all of the employés of a railroad company when engaged in interstate commerce. Hence it is urged that this statute has by implication repealed the limitation of liability statute, in so far as that may be used to limit claims for personal injury of em-

ployés when employed on work coming within the provisions of the employer's liability law.

It may be assumed that the transportation of freight and passengers by the railroad company from Jersey City across the Hudson river into New York state is interstate commerce. The employés upon the ferryboat were employés of the railroad company, therefore, engaged in an occupation within the interstate commerce jurisdiction of the Congress and the United States courts (Pedersen v. D. L. & W. Railroad [C. C.] 184 Fed. 737), and the law of 1908 is applicable thereto. It is expressly limited to the activities of a carrier by railroad. The maintenance of a ferry may be within the charter powers of a railroad company, and it cannot be said that the voyage is a carriage by rail. But the statute does not limit the liability of the carrier to its track or train service. It expressly refers to defects or negligence in boats, wharves, and other equipment, provided they and the injured party are engaged in interstate commerce. But, assuming that a right of recovery for negligence be given by this act as well as under the state statute, the law allowing a limitation of liability in admiralty might still apply, and the act of April 22, 1908, be administered in the admiralty court.

The statute allowing a limitation of liability is not inconsistent with the letter of the law, and we must look to the intent of Congress in determining whether it is in any way repealed, therefore, by the employer's liability statute, with respect to a claim such as is under consideration in this case. But the claimant herein filed his claim in this action and interposed an answer to the petition, in which he charged negligence on the part of the petitioner. He also denied the jurisdiction of the United States court, after appearing and answering to the merits.

Such a plea should have been raised in bar of the action, if the claimant objected to the trial in this court. An answer on the merits was a consent to the restriction of liability, as the court certainly had jurisdiction in admiralty of the claim, and also had acquired jurisdiction of the persons and of the subject-matter; that is, the vessel. The amendment of 1910 confers jurisdiction in personam (concurrent with the state courts) upon the Circuit Court of the United States; but this amendment was subsequent to the beginning of this proceeding and does not affect the right which the court had to proceed upon the appearance of the claimant in the proceeding in rem.

It may well be considered that the Congress in granting a broad right in personam implied an intent to repeal any compulsory limitation of liability in a particular class of cases, and that the purpose of protecting and benefiting employés shows a plain negation of the idea of defeating that right by the substitution of a limited right in rem.

But the waiver by appearance and answer makes it unnecessary to now relegate the litigants to another court, and the issue of negligence should be disposed of on the merits.

A repeal of the law allowing limitation of liability (in so far as that law related to actions for death occurring through negligence in interstate commerce) would not carry with it a repeal of the entire law,

nor of the jurisdiction of the court to determine claims in admiralty if the parties consent to the exercise of admiralty jurisdiction in determining whether any liability in rem could be shown.

A denial of jurisdiction, therefore, was not equivalent to a plea that the claimant could not be heard in admiralty against his will.

Hence the far-reaching and serious proposition, that no proceedings to limit liability can be invoked even on consent with respect to any claim that may be within the jurisdiction of the employer's liability law, is not substantiated by examination of the statute; and there is no hardship caused by allowing a limitation of liability in the present case. This accident, whether viewed from the standpoint of the statute allowing limitation of liability or from the standpoint of the employer's liability law of 1908, cannot be considered from the evidence to have been caused by negligence for which the petitioner is liable. Such a question is one of law, and the case could not get to the jury, even if it were being conducted under the statutes of April 22, 1908, and April 5, 1910, and not in admiralty.

The accident was unfortunate and shows the desirability of some compensatory method of adjustment; but, viewed from the standpoint of negligence, no liability can be ascertained. Hence the petition to limit the liability of the railroad company must be granted, and they may have a decree. Inasmuch, however, as the decedent's representative cannot maintain his action further in the state court, but has been brought into this proceeding and has not litigated the claim inequitably, the entire circumstances make it seem proper to decide that no costs should be awarded to the petitioner as against him.

---

THE DANA.

(District Court, E. D. New York. June 9, 1911.)

**1. SHIPPING (§ 121*)—SEAWORTHINESS OF VESSEL—IMPLIED WARRANTY.**
   The acceptance of cargo by the master of a lighter without objection to the quantity is an implied representation that the vessel is seaworthy for the carriage of such quantity.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 449; Dec. Dig. § 121.*

   Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal Cement & Supply Co., 60 C. C. A. 179.]

**2. SHIPPING (§ 121*)—LOSS OF CARGO—LIABILITY OF VESSEL—UNSEAWORTHINESS.**
   A steam lighter under contract to carry a deck load of 173 tons of copper to be loaded on a steamship, while lying in a slip at Hoboken that night waiting to unload, and while her crew were absent, listed and dumped a part of her cargo. She could safely carry a deck load of from 150 to 160 tons, and on previous occasions a load of 180 to 190 tons had caused her to spread and leak. The weather was calm, and under the evidence it appeared that the listing was probably caused by the presence of water in the vessel, due either to leakage caused by overloading or to water siphoning from a tank through failure to close a cock. *Held* that, in the first case, the vessel was not seaworthy for the voyage, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes