## THE WEST HARTLAND.

(District Court, W. D. Washington, N. D. September 21, 1923.)

No. 6426.

1. **Shipping ⬥209(2) —Mere delay in surrender of vessel does not bar right to limitation of liability.**

   Mere delay in surrender of a vessel after collision does not bar the right to limitation of liability, where the vessel has suffered no deterioration in the meantime, and the full value of the owner's interest at the date of collision is surrendered.

2. **Collision ⬥102—Crossing steamships both held in fault for collision.**

   A collision in Puget Sound on a clear night between two steamships on crossing courses *held* due to faults of both vessels; one being in fault for failing to sooner observe the other, the other for reversing without signal, and both for violation of other pilot rules.

3. **Collision ⬥11—Privileged vessel bound to observe rules.**

   The fact that one of two vessels is the privileged vessel does not excuse her from observing the rules, or from other precautions to avoid collision proper under the circumstances.

In Admiralty. Petition of the United States, through the United States Shipping Board, represented by the United States Shipping Board Emergency Fleet Corporation, as owner of the steamship West Hartland, for exemption from and limitation of liability. Exemption denied, and limitation granted.

On April 1, 1921, at 12:04½ a. m., the steamship Governor, with cargo, was sunk in the waters of Puget Sound, being in collision with the steamship West Hartland at a point approximately one or more miles south of a point abeam of Point Wilson. The West Hartland is a vessel of 8,800 tons dead weight, started from rest in Port Townsend Bay on a N. N. W. course set to pass at least one mile abeam Point Wilson. She was heavily laden with lumber and trimmed 15 inches by the head. She was properly manned officered, equipped, and was seaworthy. The Governor was a twin screw vessel of 5,474 gross tons and 2,550 net tons, and 391.9 feet long. She was in-bound from Victoria to Seattle, and passed off Point Wilson approximately three-fourths of a mile, and set a course of south 82° east to Point Wilson, which was changed south 68° east abeam Point Wilson. The Governor was making 15 knots per hour; the West Hartland was accelerating her speed, and at the time of the first blast of the whistle, hereafter stated, was making approximately 6 knots per hour. The vessels collided; the Governor was sunk, and the West Hartland was damaged, and was brought to the port of Seattle, where she was placed in dry dock and repaired at an expense of $63,250, which was paid by the owner. The West Hartland was owned and operated by the United States, through the United States Shipping Board and the Emergency Fleet Corporation. The Governor was owned by the Pacific Steamship Company. Shortly thereafter a libel and intervening libels in rem were filed against the West Hartland. The West Hartland was in dry dock in excess of two months, and on the 2d of December this proceeding to limit its liability, and also praying exemption from all liability, was filed. Objection is made by the appearing claimants to exemption and to limitation of liability, contending, among other things, that a timely and full surrender was not made, and the West Hartland was not seaworthy.

Bronson, Robinson & Jones, of Seattle, Wash., for petitioner.

Huffer, Hayden & Bucey, and Grosscup & Morrow, all of Seattle, Wash., Sawyer & Cluff, of San Francisco, Cal., and Bogle, Merrit & Bogle, of Seattle, Wash., for claimants.

NETERER, District Judge.  [1] The mere delay in the surrender may not be treated as an assumption of the liability of the vessel, and forfeiture of right to limitation.  The Benefactor, 103 U. S. 247, 26 L. Ed. 466.  Was the value of the interest of the petitioner at the time of the surrender less than at the close of the voyage?  The City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134.  Did the delayed surrender result in prejudice to creditors by reason of which they did not recover the amount or value of the interest of the owner, etc.?  Both questions must be answered in the negative.  The testimony is all in practical agreement that the market value was not greater at the date of the collision than at any time prior to or at surrender.  The vessel was not used for the owner's profit, was not navigated, but was at all times carefully guarded and kept at the port of Seattle in the best of care.  There is no claim of physical deterioration.  After the collision the vessel was a helpless wreck; at surrender it was fit for the sea.  If the owner has surrendered the full value of its interest in the vessel on the date of collision, liability may be limited.  The Alpena (D. C.) 8 Fed. 280; The Rose Culkin (D. C.) 52 Fed. 328; The Puritan (D. C.) 94 Fed. 365; The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Columbia, 73 Fed. 226, 19 C. C. A. 436; In re Morrison, 147 U. S. 14, 13 Sup. Ct. 246, 37 L. Ed. 60.

It is contended by claimants that the market was controlled by the petitioner, who monopolized it by withdrawing all ships of the type of the West Hartland from the market, and therefore there was no market, and hence no market value.  This contention has no force.  Conceding for the moment there is such testimony (there being none), common sense and common experience teaches that to withdraw from sale a commodity increases the demand, and enhances the market value.  The rule of reproductive costs contended for by the claimant cannot be invoked upon the record in this case.  Alaska S. S. Co. v. Inland Nav. Co., 211 Fed. 840, 128 C. C. A. 366.  There was a market value, and there was no diminution of that value from April 1st, the date of the collision, to December 2nd, the date of the surrender.  An analysis or discussion of the evidence with relation to the market value can serve no purpose.  Whether the petitioner shall recover any portion expended for the repairs need not now be determined.  The pending freight was surrendered upon order of the court when the amount was ascertained.  The Passaic (D. C.) 190 Fed. 644; The Defender (D. C.) 214 Fed. 316; The Rochester (D. C.) 230 Fed. 519.

There can be no question as to the seaworthiness of the West Hartland at the time in issue.

[2] Upon the question of exemption from all liability the testimony is confusing, some entirely inconsistent; but common experience of the ordinary landsman suggests that these vessels should not have collided.  The facts conceded are that the vessels collided at about 12:04½ a. m.; they approached on a diagonal crossing course, supra, the West Hartland being the privileged vessel; that one blast from the West Hartland was answered by three blasts from the Governor; that the navigating officer of each ship saw the lights of the other when they were at least two miles apart; that they were each in the open waters of

Puget Sound; the view was unobstructed; there was a slight mist; the atmosphere was clear; all aids to navigation were visible; both vessels were moving forward at the time of collision, the Governor on starboard helm. I also think it is established that the Governor could stop from full speed ahead, on full speed astern, within three lengths of the vessel, or approximately 1,200 feet in 1½ minutes or less. She was moving 1,500 feet a minute, at the time of the *one* blast, and was therefore within 1,500 feet of the West Hartland when the one blast was given.

The testimony of all of the witnesses with relation to the time between the various blasts and acts is based on approximation. There is only one witness who, from his testimony, looked at the clock, which was at 12:04½, 12:03, 12:02. This witness says he looked at the clock, and the one blast was given about 12:02, and the three blasts about 12:03, and the order for full speed astern by the West Hartland was given at 12:03. The witness confessed he could not give the exact time of things which he saw or heard while on the bridge, as he had to go into the pilot house to see the clock, so that all the testimony with relation to time has an element of approximation. All of the witnesses testified that the one blast, three blasts, and collision were almost simultaneous. The engineer of the West Hartland testified that the one blast and order for full speed astern were given simultaneously, as nearly as may be, and he cannot tell which was given first. The second assistant engineer of the Governor says the one whistle and three blasts were almost simultaneous. After three whistles, he got up, looked out, and the West Hartland "was right on us."

Another witness heard three blasts, the boat slowed down, and then the crash came in not over half a minute; "the crash almost threw us out of our chairs." Another heard one whistle, then three, and then the crash. The third officer of the Governor heard one blast, then two by the Governor, immediately followed by three blasts; the engine going full speed astern. This is the only witness who testified to more than the one blast and the three blasts. The chief mate of the West Hartland heard three whistles, jumped out of his bunk, and dressed; but vessels collided before he had his shoes on. Another says the time between one blast and collision was less than one minute. Another witness says the West Hartland was approximately 1,000 feet away; order to stop by Governor, and three blasts were nearly as simultaneous as may be. Another witness: Governor turned to port fast after three blasts and collision followed. Another: There was not much time between one blast and three blasts and the collision.

The only way to solve the issue is to begin at the point of collision and go back, rather than beginning at the point off from Point Wilson, and off Point Hudson, the respective locations of the ships at 11:57. From the testimony, I am satisfied the Governor could have stopped from full speed ahead within three lengths of the vessel, or approximately 1,200 feet, in 1½ minutes or less. She was moving 1,500 feet a minute at the first blast, and was therefore within 1,500 feet of the West Hartland when the first blast was given. The petition for limitation says 1,200 feet and one witness says 1,000 feet.

The conclusion, I think, is inevitable, that the West Hartland immediately followed the first blast with full speed astern, without indicating the maneuver. There is no doubt in my mind that the Governor was less than 1,000 feet from the West Hartland when the blasts were given, and that, if the Governor had gone full speed ahead on a starboard helm and the West Hartland full speed astern after the blasts were given, the Governor would have been beyond the point of collision at the time the West Hartland approached it. I am likewise convinced that if the West Hartland had gone full speed ahead on her course, and the Governor full speed astern, the West Hartland would have been beyond the point of collision when the Governor approached it.

While the West Hartland might not be able on full speed astern to gather much sternway after the blast before the collision, the full speed ahead would no doubt have carried her beyond the point of collision with full speed astern by the Governor. Both of these vessels are without doubt at fault. The Governor is grossly negligent in not discovering the West Hartland, and especially after the bright red light was emphasized on the mind of the navigating officer, and he was in doubt, as he testifies. He says: "It seemed to me that it was *unusually bright* for the Fort Flager light." Again: "It seemed to me an *unusually bright* light." Yet he proceeded without any other affirmative act on his part, and also violated rule 3, Pilot Rules, Inland Waters. The navigating officer of the West Hartland was negligent in violating article 21, at the time of the collision, and also violated rule 3 of the Pilot Rules in failing to give a timely passing whistle, and also violated rule 7, on reversing her engines without proper signals.

[3] What was said in The Admiral Watson (D. C.) 266 Fed. 122, applies here:

"The fact that a vessel is privileged, and entitled to hold her course, does not excuse her from adopting such precautions as may be required by statute, and necessary to prevent a collision. * * * The primary purpose of rules of navigation, as said by the Supreme Court, is not to fix arbitrary rights of the road to vessels, but rather for the safety of life and property."

Upon the record in this case the cases (noted in the margin) [1] cited by the petitioner rest on a different state of facts.

Both vessels were at fault, and the damages should be divided, exemption denied, objection to limitation denied, and limitation of all liability granted.

[1] The Binghampton (C. C. A.) 271 Fed. 69; The Mexico, 84 Fed. 504, 28 C. C. A. 472; City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; Ludvig Holbert, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Persian, 224 Fed. 441, 140 C. C. A. 135; The Bellingham (D. C.) 138 Fed. 619.