### BRAUER et al. v. CAMPANIA NAVIGACION LA FLECHA.

(Circuit Court of Appeals, Second Circuit. March 5, 1895.)

1. SHIPPING—LIBEL FOR LOSS OF CATTLE—PRACTICE.

Where cattle injured by perils of the sea are thrown overboard together with others not injured, the failure of respondent to prove a definite number as injured does not make him liable for all that were lost, but the court will endeavor to ascertain the number injured with as near an approach to accuracy as the testimony will permit.

2. SAME—CONSTRUCTION OF BILL OF LADING—EXCEPTED PERILS.

The sending overboard, during a severe storm, of sound cattle along with the maimed, without any attempt to separate and save the former,

because of exaggerated apprehensions on the part of master and crew, and their deep sense of the inconveniences caused by the presence of the cattle on deck,—the ship being in no actual peril, and the sacrifice being unnecessary to the preservation of other property,—*held* not to come within clauses of the bill of lading excepting the carrier from liability for losses occasioned by "accident or mortality, from whatever cause arising," or by "causes beyond his control, by perils of the sea, * * * by accidents of navigation, of whatever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners," etc. Wallace, Circuit Judge, dissenting, on the ground that the acts of the master were justified, under the proofs, by a prudent regard for the safety of the ship. 57 Fed. 403, affirmed.

3. ADMIRALTY APPEALS—QUESTION NOT RAISED BELOW ON AN ASSIGNMENT OF ERRORS.

A point not presented in the district court, or pointed out in the assignment of errors, will not be considered in the circuit court of appeals.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by William W. Brauer and Frederick C. Brauer, copartners as W. W. Brauer & Co., and the Reliance Marine Insurance Company, Limited, against the Campania Navigacion La Flecha, to recover damages for the loss of certain cattle shipped on respondent's steamship Hugo. The district court rendered a decree for libelants for part of the cattle lost (57 Fed. 403), and subsequently modified and affirmed the report of the commissioner appointed to ascertain the damages (61 Fed. 860). Both parties appeal.

MacFarland & Parkin, for libelants.

Butler, Stillman & Hubbard and Wilhelmus Mynderse, for respondent.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The libelants, being the persons who constituted the firm of W. W. Brauer & Co., and the Reliance Marine Insurance Company, brought their libel before the United States district court for the Southern district of New York against the Campania Navigacion La Flecha, a Spanish corporation, and the owner of the steamship Hugo, in which libel they alleged that on October 24, 1891, William W. Brauer & Co., being the owners of 165 head of cattle, shipped the same in good order and condition on board the steamship Hugo, then lying in the port of New York, and bound to the port of Liverpool, in England, and to be carried to said port, and that the shippers thereupon received from the master or agent of said steamer a bill of lading whereby he undertook, on behalf of the owner of said vessel, to carry the cattle to Liverpool, and there to deliver the same to the said shippers, or their order, they paying freight therefor; that on or about October 31, 1891, the said vessel, while on her voyage to Liverpool, with the cattle on board, having encountered rough weather, the master and crew of said vessel became panic-stricken, and drove overboard 126 head of cattle; that the act of said master and crew, in driving overboard said cattle, was wholly unnecessary. Thereafter, the vessel

arrived safely in the port of Liverpool, and delivered to the shippers or their agents 38 of said cattle in good condition (one having died), but failed to deliver the 126 head, whereby the libelants sustained damage. The respondent, in its answer, admitted that 126 head of cattle were lost, but averred: That by the terms and conditions of the contract and bill of lading under which the cattle were received for transportation and delivery, it was provided that the carrier should not be liable for loss or damage occasioned by causes beyond his control, by the perils of the seas or other waters, or by other accidents of navigation, even when occasioned by the negligence, default, or error in judgment of the master, mariners, or other servants of the shipowner, and that the cattle were carried on deck at the owners' risk, and under a special provision that the steamer should not be held accountable for accident to or mortality of the animals, from whatsoever cause arising. There was a further provision that the contract should be construed and governed by the law as administered in the courts of Great Britain, with reference to which law the contract was made. And that the loss of said cattle was due to the perils of the sea encountered upon the said voyage, which broke certain of the cattle houses and set the cattle adrift, and that during the continuance of the perils, and by reason thereof, certain of the cattle were washed overboard, and others were thrown about the deck, bruised and with broken limbs, and reduced to a dead, dying, or helpless condition, and that upon such being taken to the gangways they were washed over by the seas. And that the care given to said cattle was according to the best judgment of the master of said steamer, and that if he erred in his judgment, or was in any degree negligent, the respondent was absolved from accountability and responsibility, by reason of the terms of the bill of lading, and by the law as administered in the courts of Great Britain. The history, in outline, of the three days during which the events in controversy occurred, is stated by the district judge as follows:

"The steamer sailed from this port on the 24th of October. During three days, from October 30th to November 1st, inclusive, the vessel met heavy weather, during which there was heavy rolling of the vessel. The cattle were in pens on deck,—a few forward, under and near the turtle back, which were saved. The rest were in the vicinity of Nos. 3 and 4 hatches, forward and aft of the engine room, in pens built in the wings on the port and starboard sides of the ship, all of which were lost. The storm was heaviest on the afternoon and night of Saturday, the 31st; the wind and seas coming first and heaviest from the northwest, but on Saturday hauling to the northward and to east northeast, with cross seas. Some slight damage was done to a few pens on the 30th. More were broken on Saturday, the 31st; but these were repaired, and the cattle put in place towards nightfall. About 5 o'clock on that day the after gangways were opened on each side, and about 10 or 12 cattle that had become maimed and helpless were sent overboard through those gangways. The chief loss was during that night and the following morning, when, shortly after daylight, the captain gave orders to open the forward gangways, also; and the whole deck was cleared of all the cattle, save the 39 under the turtle back."

The principal questions of fact in dispute which arose under this general statement were as to the character and severity of the

storm, and the necessity which existed for the drowning of the
cattle, and, if there was an absence of necessity, whether the con-
duct of the captain, in clearing the decks of the entire number of
cattle, except those under the turtle back, was or was not a destruc-
tion of property which could not be characterized as resulting from
negligence, or the accidents of navigation.    The libelants also in-
troduced expert testimony to show that the judgment of the master
in regard to the navigation of the ship at the time of the storm
was defective, and that the ship was badly handled.    The district
judge, having quoted at length from the testimony, and stated the
various considerations which influenced his mind, came to the fol-
lowing conclusions upon the questions of fact:

"Upon the whole testimony in this pitiful case, I am not disposed to pro-
nounce any unfavorable judgment upon the handling of the ship by the
master. His record as a master appears to have been good, and, on any
doubtful question of navigation, he is entitled to the benefit of his record.
He had some, though not large, experience in the transportation of cattle;
and the experts called by each party place so much stress upon the special
circumstances of the situation, the quality of the ship, and the necessary de-
termination of the master's own judgment at the time, that, in the circum-
stances testified to, I do not find any conclusive proof adverse to the master's
judgment as to the navigation of the ship. The evidence leaves not the least
doubt in my mind, however, that the sacrifice of a considerable number of live
cattle that were not maimed or substantially hurt was made on the morning
of Sunday, the 1st of November, not from any pressing necessity, but solely
from mere apprehension, and I am further persuaded that there was no rea-
sonable or apparent necessity for the sacrifice. It was morning. The night
was past. No one testifies to any pressing peril to the ship. The log does not
hint of it. No reason appears why such cattle as could go about, and were
actually going about, should not have been cared for and preserved. There
was plainly no effort made to separate the sound from the maimed. Even
the master says, in answer to the question, 'Were these cattle standing up
that went overboard? A. They were down. Some may have been up. I
don't know.' His object, plainly, was to clear the deck of all the cattle from
No. 3 aft, with no attempt to discriminate, or to save any. His state of mind
is shown by his concluding words, 'We all breathed happily when we saw it
open [No. 3 hatch].' "

His legal conclusion was that the libelants were entitled to a
decree; and a reference was had to a commissioner to report the
damages for such of the oxen as were of any market value, and not
fatally wounded or maimed at the time when the houses and cleats
provided for them were designedly torn up, and which were cast
overboard, or negligently or designedly suffered to go overboard,
through the open gangways, on the morning of November 1st, and
on the evening and night previous.    The commissioner heard some
additional testimony from one of the two cattlemen who had pre-
viously testified, re-examined all the evidence before the district
court, and made a lengthy report.    His history of the last two days
of the storm, and of the destruction of the cattle, is so full, and is
stated with such care, that it is quoted in extenso:

"The next morning, October 31st, between eight and nine o'clock, the master
stopped the vessel, repaired the pens by replacing a few boards, but leaving
them without coverings; and all the loose cattle were put back into the pens,
watered, and fed, except the one fatally injured, and the vessel then pro-
ceeded on her course. The wind and the seas, however, increased until about

two o'clock in the afternoon, when the seas again broke the pens that had been repaired, and the cattle came out, and went loose again, and collected upon the starboard side of the vessel. The engine was then stopped, but according to the testimony of the master, corroborated by other witnesses of the respondent, the wind and the sea had so increased that he was unable to put these cattle back again into pens. Nor do I see that the cattlemen showed any disposition to try and do so, or to seek to have it done. From two o'clock until about five that afternoon, these loose cattle were especially exposed to the effect of the wind and sea. At this time the master, anticipating, and having, I think, reason to anticipate, a very severe night, determined to open the gangway on the starboard side, opposite No. 4 hatch, and let these loose cattle go overboard, and free the vessel of them; and the result was that the above-mentioned fatally hurt ox, and nine others, were designedly sent overboard by the master. I find, on the evidence, that all these nine cattle were set loose by the sea from the stalls or pens on the port side, and not by the action of the master or crew. I also find that the only breaking down of pens and taking up of flooring and cleats by the master or crew that day, or the following night, were of such as were in front of the gangway opposite No. 4 hatch, on the starboard side. But the evidence shows, as it appears to me, that these were removed by order of the master; and the cattle in them, I think, must have gone overboard, and were designedly suffered to go overboard, through this gangway. How many there were of these does not clearly appear, but I think it may be assumed that at least two of these pens, covering a space of say sixteen feet in length, were taken down, and the flooring removed, and the cattle—say, at least, eight—allowed to go overboard. I am inclined to think that the opening of the gangway on the starboard side, opposite No. 4 hatch, was determined upon by the master, not merely for discharging the ten loose cattle from the port side,—for why could not this have been done through the starboard gangway, opposite the deckhouse,—but that it was a part of his preparation for the night to have this gangway opposite hatch No. 4, and the gangways on each side of the deckhouse, open for the night, for the reason, stated by him, that, in case cattle should be carried down to either of these gangways during the night, they might go overboard. There is evidence that some of the remaining cattle did go through some of these gangways during the night, and they must, I think, be regarded as designedly suffered to go overboard. No doubt, the night was a trying one. The master remained up all night. Nothing, apparently, could be done to relieve the situation, beyond lying to in as favorable a way as possible; and so the vessel pitched and rolled all night, and the seas beat over the deck. I am compelled to believe that the pens, except those well forward, under and near the turtle back, were very much injured, and that the cattle which these contained, or at least very many of them, suffered severely. I think I am justified in this view, without accepting the extreme statements of the witnesses on either side. On the morning of November 1st the storm had not begun to abate. On the statements on the log, and of the master and other witnesses on the part of the respondent, all the cattle, except the thirty-nine under or near the turtle back, were loose, and very many of them in a wrecked and ruined condition, from the effects of the storm; and the master thereupon determined to open another gangway,—that on the starboard side, opposite No. 3 hatch,—and through these gangways, thus opened, to clear the deck of all the loose cattle, and in pursuance of this determination he designedly suffered or compelled all that remained of the 126 cattle, for the loss of which this suit is brought, to go overboard."

His conclusion was "in favor of the probability that the proportions between the dead and the fatally maimed and wounded, on the one hand, and those that were alive, and not fatally maimed or wounded, on the other, are about equal." The damages resulting from the destruction of 63 head of cattle, amounting to $6,839.54, were decreed by the court in favor of the libelants, with costs. From this decree each party appealed.

The questions in the case are mainly those of fact, for when the facts, and the reasons which directed the captain's conduct, are clearly settled, the questions of law are not perplexing. It cannot be denied that the ultimate facts are not easy of ascertainment. The witnesses for the libelants were two of the cattlemen, with manifest and strong prejudices against the captain and crew, and with a desire to protect themselves from the charge of having skulked during the storm. On the other hand, all the respondent's witnesses, except the chief engineer, were foreigners, who spoke through an interpreter. Mudie, the chief engineer, was a Scotchman; and, although he saw what was done on Sunday morning, he was not questioned upon that subject. The oral testimony of all who testified in regard to the condition of the cattle was much exaggerated, and the circumstances and the probabilities resulting therefrom must be our guide in coming to a conclusion. The facts which appear to us to give character to the acts of the master are the following: Before the night of the 31st the cattle had received but little damage. The district judge finds that before nightfall the pens were repaired, and the loose cattle were put back in their places. The carpenter testified to this, but the testimony of the captain and of other witnesses for the respondent is to the effect that on this afternoon they could not put the cattle back in their pens; and as this part of the history is not of vital importance, and we prefer to base our conclusion upon facts substantially proven, we express no opinion upon this point. But it is true that about 5 o'clock on the afternoon of the 31st the captain took up the flooring and cleats in two pens, containing eight cattle, in front of the gangway opposite No. 4 hatch, on the starboard side. This was done not merely to discharge the 10 loose cattle on the port side, one of which was fatally injured, and perhaps the others, who were also designedly sent overboard, were maimed, but this gangway was opened and left open for the night, so that the cattle might easily be carried down to it, and might go overboard. The fact that the flooring and cleats were taken up, so that the cattle might have no foothold during the night, but be carried down to the gangway by the rolling of the ship, is significant that the captain wanted to expedite the delivery of cattle into the ocean. He wanted this not for the safety of the ship, or to end the sufferings of maimed cattle. The preparations were made so that sound as well as maimed cattle could be washed overboard. Whether, during the night, sound cattle were actually washed overboard, cannot be known with certainty. On Sunday morning, the testimony makes it apparent that the master determined to rid the ship of every head of cattle, except those under the turtle back. He intended to clear the decks of cattle, whether well or injured, and no effort was made "to separate the sound from the maimed." The cattle not injured were pushed or prodded and driven across the slippery iron deck, and were hurried over the gangways as rapidly as possible, and in a short space of time. "No attempt was made to discriminate or to save any," because the master and

the crew wanted none saved. We concur with the district judge in the conclusion that there was "no reasonable or apparent necessity" for the nonexistence of an attempt to separate the two classes. There was a storm, but nothing belonging to the ship was injured. No one testifies that anything was loosened or unshipped, or that there was any leakage, and no one claims that she was in pressing peril. The sacrifice was not to save the vessel or her cargo, but the presence of the cattle during the storm was a great inconvenience, and there was, as found by the district judge, an apprehension that the storm would continue, and that the existing inconvenience would be increased. The reason for throwing both sound and maimed cattle overboard was a great dissatisfaction with the existing state of the decks, an apprehension that the same state of things would continue, and a determination to put an end to trouble from cattle. The commissioner has found that it is impossible to tell, with mathematical accuracy, the number which were thus sacrificed. That some were injured, and perhaps some were incapable of moving themselves, is perhaps apparent from the time which was taken to clear the ship while the work was hindered by the storm. The work commenced between 6 and 7, and was finished at 11. That a pile of dead or maimed cattle should be removed in that time, during the storm, by the aid of a donkey engine, is improbable. But for the very careful study of the question by the experienced commissioner, we should be inclined to place the number of the uninjured at a higher figure than he did, but the testimony has no such approximation to accuracy as to enable us to say that he was wrong. In view of the fact, which is undoubtedly true, that fatally injured cattle were properly thrown overboard, the libelants' claim is not well founded,—that, in the absence of proof by the respondent of any definite number, it must be held liable for all that were lost. It is not reasonable to suppose that, under the circumstances which have been described, accuracy in regard to the number of the sound cattle which were designedly permitted to go overboard was attainable. It is both reasonable and just to endeavor to ascertain the number with as near approach to accuracy as the testimony will permit, and not to solve the question with known inaccuracy, by throwing the entire loss upon the carrier.

The respondent relies for freedom from liability upon the terms of its contract, which are claimed to furnish immunity from the acts of the captain. The bill of lading declares that the cattle were shipped "on deck, at owner's risk; steamer not to be held accountable for accident to or mortality of the animals, from whatsoever cause arising." The acts which drove the 63 animals into the ocean were not an accident. Neither is the destruction by the same violence to be regarded as the "mortality" to which the rest of the clause relates. The respondent had undertaken to transport the animals safely to Liverpool. Its agents had taken charge of them, and entered upon the service. The clause relieving the carrier from liability in case of mortality has no relation to the

consequences of the violence which pushed the animals into the ocean. But the respondent relies chiefly upon the provision which relieved the carrier from liability for losses "occasioned by causes beyond his control; by the perils of the sea; * * * by accidents of navigation, of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowner"; and by the provision which declared that the contract should be governed by British law, with reference to which it was made. Waiving the question whether, at the time when the contract was made, contracts which relieved carriers by sea from the consequences of the negligence of the master were not void, as against the public policy of this country, the acts of the master and crew of the Hugo in regard to the 63 cattle were not occasioned by an accident of navigation caused either by the negligence or error in judgment of the master. It was an entire clearance of the decks, without apparent necessity, and with no attempt to discriminate, or save any. There was no pretense that it was to save the ship or the cargo, or that it was necessary to sacrifice these animals for the benefit of the survivors. While the defense upon the facts is that the animals thrown into the ocean were either dead, or so maimed or so helpless, that they could not live, and there is no claim that sound animals slipped into the sea, either by negligence, or were thrown into the sea through error of judgment in regard to their condition, yet if it is found that this defense is not sustained, and that the master intentionally caused the drowning of sound cattle, the respondent insists that it is relieved because such determination of the captain was the fruit of an error of judgment. The reasons which actuated the master have already been stated. He had an apprehension of a continuance of the storm, and he consequently had an apprehension that more cattle might be injured; but he also had a deep sense of the inconveniences to which his cargo on deck subjected him, and the combined emotions were significantly suggested by the assertion, "We all breathed happily when we saw No. 3 hatch open." The act of the master was not the result of an opinion that the drowning of the sound cattle was called for by prudential considerations for the ultimate safety of the lives or the property in his charge. The question remains whether, apart from the question of negligence, the loss was occasioned by one of the excepted causes of calamity. The injury to and the drowning of the maimed animals were caused by the perils of the sea. Under the facts, as found by this court, nondelivery of the sound cattle was not caused by a peril of the sea, or the accidents of navigation, or circumstances properly incident to navigation. The master's unfounded but existing apprehension in regard to the future relieves his conduct from a charge of barratry. There was a destruction of property, but it was not so much tainted with dishonest views or fraudulent breach of trust as to come within the definition of barratrous conduct.

The respondent offered proof of the British law, as announced by English decisions, which permits the shipowner to relieve himself,

by express contract, from the consequences of the negligence of his captain or crew; but no decision touches with any closeness the state of facts which are disclosed in this record, and we are left to decide, without the aid of English authorities, the question whether the acts of the master which caused the nondelivery of 63 cattle were within the clauses in the bill of lading which freed the shipowner from liability.

The respondent's counsel has presented the point in his brief that the commissioner and the district court erred in the assessment of damages, because the market price of the cattle should have been taken at the port of destination, instead of at the port of New York, with freight and cost of maintenance. It is sufficient to say that this point was not presented in the assignment of errors. Neither was it presented to the district court in either of the exceptions to the commissioner's report. The question seems to have been raised in this court for the first time. The decree of the district court is affirmed, without costs in this court in favor of either appellant.

WALLACE, Circuit Judge (dissenting). I dissent from the opinion of the majority of the court. I do not think that the master sacrificed the uninjured cattle simply for the sake of the comfort and convenience of the ship. I agree with the commissioner when he says, "I do not doubt the entire good faith of the master, and that he would gladly have saved the other cattle, as well as the thirty-nine that remained on board." The theory of the libel is that the master and crew of the vessel became panic-stricken, and drove the cattle overboard, and the evidence more nearly supports this theory than the one which has been adopted. I think a prudent regard for the safety of the ship and crew, in view of the situation as it was at the time, justified him in clearing the deck of the mass of dead and wounded cattle, and that it is idle to say that there was any practicable opportunity, upon that storm-swept deck, to separate the dead cattle from the wounded and dangerous live ones. After the event, and with the wisdom which comes from retrospect, it is not difficult to conjecture, in case of disaster, what might have been done that was not done; but I am satisfied from the proofs that the master did everything which a prudent and honest navigator would have done, under the circumstances, from the time he hove to his vessel until the hurricane was over, and that the loss of the cattle was caused by perils of the sea, and therefore within one of the excepted risks of the bill of lading.