YANG-TSZE INS. ASS'N et al. v. FURNESS, WITHY & CO., Limited (and fourteen other cases).

(Circuit Court of Appeals, Second Circuit. June 10, 1914.)

No. 201.

**1. COLLISION (§ 107*)—STEAM VESSELS CROSSING—SPECIAL CIRCUMSTANCES RULE.**

The privileged one of two crossing vessels is not relieved from the duty of keeping her course and speed as required by article 21 of the International Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 320 [U. S. Comp. St. 1901, p. 2870]) by article 27, which authorizes a departure from the rules under special circumstances which render such departure "necessary in order to avoid immediate danger," unless there is clearly immediate danger, and then the departure must be no more than is necessary.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 224; Dec. Dig. § 107.*]

**2. COLLISION (§ 123*)—CONTRIBUTORY FAULT—VIOLATION OF RULES.**

Where a ship at the time of collision was acting in violation of a statutory rule, the burden is on her to show, not merely that her fault might not have been one of the causes of the collision, but that it could not have been.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 259–261; Dec. Dig. § 123.*]

**3. COLLISION (§ 40*)—STEAM VESSELS CROSSING—MUTUAL FAULTS.**

The steamships Alleghany and Pomaron both *held* in fault for a collision at sea in open weather and in the daytime while on crossing courses, in which the Alleghany was sunk, her fault being the failure to maintain a lookout, although the vessels were within sight of each other for several miles, and that of the Pomaron, which was the privileged vessel, a change of course without necessity.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 40; Dec. Dig. § 40.*]

**4. EVIDENCE (§ 37*)—JUDICIAL NOTICE—LAWS OF FOREIGN COUNTRY.**

Although the local laws of both countries to which two foreign vessels in collision on the high seas belong may coincide in providing that liability shall not be in solido, but in proportion to the degree in which each vessel is in fault, courts of admiralty of the United States cannot take judicial notice of such laws, nor apply such rule unless they are pleaded and proved.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 52; Dec. Dig. § 37.*]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal to review a decree of the District Court of the United States for the Southern District of New York in favor of certain owners and underwriters of cargo of the German Steamship Alleghany for damages resulting from the total

loss of the cargo as the result of a collision with the Pomaron on February 2, 1912. The original libels were filed against the owners of the two vessels jointly. But the Hamburg-American Company, the owner of the Alleghany, filed a petition for the limitation of its liability and surrendered the amount of its pending freight for the voyage and the libels were thereupon stayed as to that company.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham, Norman B. Beecher, and Robinson Leech, all of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (Howard S. Harrington, of New York City, of counsel), for appellees Coleman and others.

Convers & Kirlin and Lawrence Kneeland, all of New York City (J. Parker Kirlin, William H. McGrann, and Kneeland, Harison & Hewitt, all of New York City, of counsel), for other appellees.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. Furness, Withy & Co., Ltd., a corporation created by and existing under the laws of the United Kingdom of Great Britain and Ireland, prosecutes this appeal to reverse a decree of the court below. Fifteen separate libels were filed against the above-named corporation. The separate libelants were Yang-Tsze Insurance Association, Ltd., et al., Nord-Deutsche Insurance Company et al., Federal Insurance Company, Walter Oloffson et al., M. H. Silvera, Hazen & Co., Boston Insurance Company, Walter Despard, Eugene J. F. Coleman, Marshall K. Weidensaul, Frances W. Van Praag, Orton G. Orr, Laura Moore, Louis Bertschman, United States of America. The various libelants brought suits for cargo losses except the United States. The government suit was for loss of registered mail carried by the steamship Alleghany which sank at sea because of a collision with the steamship Pomaron, and the suits were brought against the owners of the latter vessel. The suits were brought on for trial simultaneously, having been consolidated and heard on the pleadings and proofs. The court below rendered a decision that the libelants were entitled to recover. One decree was entered awarding in all, damages and costs amounting to $172,029.81.

This collision occurred off the capes of Virginia about 11:30 a. m. on February 2, 1912. The Alleghany was on a voyage from New York to the West Indies. The vessel was an ordinary tramp steamer, 310 feet long. The Pomaron was a steel screw steamship of 1,809 tons gross and 1,027 tons net, 278 feet long and belonged to Furness, Withy & Co., Limited. She was on her way from Baltimore to European ports and loaded with grain and general cargo. The Pomaron sighted the Alleghany about an hour before the accident, the latter being some 10 or 12 miles away and on her port hand. Each vessel kept her course and speed for some 45 minutes. During this time the chief officer of the Pomaron had the Alleghany under constant observation. But all this time the Alleghany had not seen the Pomaron at all. This was occasioned by the fact that her chief officer, then on watch, had taken his observation and gone into the chartroom to calculate his position.

The Alleghany did not discover the Pomaron until the latter blew one blast on her whistle and ported her helm. This was between five and seven minutes of the collision. Between the time when the Pomaron saw the Alleghany and the time when she blew the blast on her whistle the two vessels had continued to approach each other without change of course or speed. At the time the Pomaron sounded the whistle the two vessels were about a mile apart and the Alleghany was proceeding at a speed of 11½ knots per hour and the Pomaron at a speed of 9 knots. After the Pomaron sounded the whistle the Alleghany shortly blew two blasts, and thereupon the chief officer of the Pomaron at once rang the engines full speed astern and ordered the helm hard aport. He testified that after he had run full speed astern he saw the Alleghany had put her helm hard astarboard and he could see—

"she was swinging around, her stern was flying into us, and of course, when he put his helm hard astarboard, his stern swung around and caught us on the bow, about abreast of No. 3 hatch."

[1] The bow of the Pomaron struck the starboard quarter of the Alleghany about 100 feet from her stern, and about 3 o'clock in the afternoon the Alleghany sank. Before the collision the Alleghany was on a course approximately south and the Pomaron on a course approximately east, the vessels being on crossing courses and the Alleghany having the Pomaron on her starboard hand. As the two vessels were on crossing courses they were subject to article 19 of the International Regulations. That article is as follows:

"When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other."

And article 21 provides:

"Where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed."

The Pomaron was to the southward and westward of the Alleghany and on the latter's starboard hand as the two vessels approached each other. These respective courses had been maintained for several hours prior to the collision, and the two vessels were about a mile apart when the Pomaron, the privileged vessel, changed her course to starboard. In doing so she failed to comply with article 21. The Pomaron seeks to excuse its porting under article 27. That article is as follows:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

It becomes necessary, therefore, to inquire whether the special circumstances as they existed at the time the Pomaron altered her course was justified under article 27. The application of rule 27 is restricted by its terms to situations of immediate danger. That rule applies only to exceptional cases. As said by the Supreme Court in The Oregon, 158 U. S. 186, 202, 15 Sup. Ct. 804, 39 L. Ed. 943, exceptions to the rules are to be admitted—

"with great caution and only when imperatively required by special circumstances of the case. It follows that, under all ordinary circumstances, a ves-

sel discharges her full duty and obligation to another by a faithful and literal observance of these rules."

In Marsden's Collisions at Sea (6th Ed.) p. 455, it is said:

"But article 27 applies only to cases where 'there is immediate danger, perfectly clear'; and the departure from the rules must be no 'more than is necessary."

The "special circumstances" apparently relied upon to excuse the Pomaron under article 27 is the testimony of the officer in charge of the vessel that he could see no one on the bridge of the Alleghany. And attention is called to the doctrine of the Supreme Court in The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, where it is said:

"The weight of English, and, perhaps, of American authorities, is to the effect that if the master of the preferred steamer has any reason to believe that the other will not take measures to keep out of her way, he may treat this as a 'special circumstance,' under rule 24 (now rule 27), 'rendering a departure' from the rules 'necessary to avoid immediate danger.' "

And the officer in charge of the Pomaron insisted that the change in the Pomaron's course did not cause the collision. His testimony was as follows:

"Q. What was the danger? A. I saw if he was going to keep on the way he was doing he would catch us somewhere about the engine room. Q. If you had maintained your course he would have struck you near the engine room? A. Yes, about midships. Q. If you had both maintained the courses you were on then without change, what do you think would have happened? A. He would have run into us amidships. Q. Are you sure of that? A. Yes. Q. Wouldn't he have got across your bow? A. No, sir; couldn't have done it. Q. Could you have possibly got across his bow? A. No."

And on cross-examination he was asked:

"Do you think collision would have happened if you had not ported your helm? A. Yes, it would have happened in any case; she would have caught us somewhere probably about amidships if I had not ported."

But there can be no doubt that it was the duty of the Pomaron to have kept on her course until a departure was necessary to avoid immediate danger. At the time she ported her helm she was a mile away from the Alleghany, and the circumstances had not yet developed which justified any departure from the established rules. Her chief officer was asked:

"In order to get the matter quite plain on the record, will you tell us when it was that in your judgment the circumstances had developed so that collision became unavoidable unless you did something."

To which he replied:

"Really not until the Alleghany had given me two blasts on the whistle."

At that time the two vessels were, according to his testimony, half a mile away from each other. He testified that up to that time he had appreciated risk of collision, but thought it might have been avoided by the other vessel. He was then asked: "Then it became under the rule your duty to do something." And he answered, "Yes." "It had not been your duty to do anything before that?" To which he replied,

"No, sir." It is established, therefore, upon the testimony of the chief officer of the Pomaron, that he departed from the rule before it was necessary for him to do something to avoid an otherwise unavoidable collision.

[2] We are obliged, therefore, to hold that the Pomaron not only violated article 21 but that in doing so was not excused under article 27. Concluding then, as we have, that the Pomaron was in fault, it remains to inquire whether the fault contributed to the collision. For if the fault had nothing to do with the collision, it may be disregarded. The law unquestionably is that in cases of collision liability for damages rests upon the ship or ships whose fault occasioned the injury. And in considering whether this fault of the Pomaron contributed to the collision it is necessary to keep in mind the rule laid down by the Supreme Court in The Pennsylvania, 19 Wall. 125, 136 (22 L. Ed. 148 [1873]), where the court said:

"But, when as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was  *  *  * a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

The principle thus laid down that, when a ship at the time of the collision is acting in violation of a statutory rule the burden is on her to show, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been one of the causes of the collision, has been reaffirmed in subsequent cases, and is the law beyond all controversy. Richelieu Navigation Co. v. Boston Marine Ins. Co., 136 U. S. 408, 422, 423, 10 Sup. Ct. 934, 34 L. Ed. 398 (1890); Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264, 37 L. Ed. 1218 (1893). And the same rule is established in the English courts. The Agra, L. R., 1 P. C., 501, 504, 505. The Elizabeth Jenkins, L. R., 1 P. C., App., 501. Under these decisions the burden of proof rests upon the Pomaron to show that the fault she committed could not have been one of the causes of the collision.

[3] But whether the collision would or would not have occurred if the Pomaron had held her course and speed cannot now possibly be determined because of the doubt which exists as to the exact bearing of the Alleghany from the Pomaron at the time. The bearing entered in the Pomaron's log is "about northeast," but both her chief officer and her wheelsman have testified that this is not correct, and that the bearing was between four and five points, nearer five than four. But the officer of the Pomaron for some inconceivable reason contented himself, after his discovery of the Alleghany, with one hasty sight over the compass to ascertain whether or not the bearing of the Alleghany was changing. He admitted that he watched the bearing of the Alleghany "just roughly," and that he "didn't bother to take any bearings at all," and that the Alleghany's bearing might have been more, or it might have been less, than three points if he "had taken a correct bearing." He is not to be excused for his failure to take correct bearings, and

should have taken several correct bearings during the 46 minutes which elapsed from first sighting the Alleghany to the collision, or during the 39 minutes from first sighting her to his change of course. Asked as to whether he took the bearing by the compass, he replied:

"It was not a proper compass bearing; I just glanced over the top of the compass and took a rough bearing."

Then he was asked:

"It was not a guess, you looked at the compass?"

To this he answered:

"It was not a true bearing, not an accurate bearing."

He also testified that at that time the Alleghany was bearing northeast and was three points or more on his port bow. The Alleghany remained on her original course until just before the collision. Whether she changed just before the collision is not free from doubt. The officer of the Alleghany who was on watch at the time says that "no commands were given to the steersman of the Alleghany," although the chief officer of the Pomaron states that the Alleghany swung under a starboard helm. If the Alleghany did bear northeast and was three points on the Pomaron's port bow when the latter changed course, it is a demonstrable proposition that a collision would not have occurred if both vessels had continued on as they were, neither one changing her course. It can readily be ascertained by applying the speed ratios whether the intersections of the known courses would be coincident, whether or not the two vessels would come together. If the Alleghany was three points on the Pomaron's port bow and had not changed her speed or course, she would have passed the point where the two courses intersected safely, and some seconds before the Alleghany reached it. And if as some of the testimony indicated the Alleghany was five points on the Pomaron's port bow, the Alleghany would have passed the point of intersection about two minutes before the Pomaron reached it. But in reality the contradictions in the testimony as to what the actual bearing of the vessels was makes it impossible to demonstrate whether or not any change at all in the Pomaron's course or speed was necessary to avoid collision. We have already cited the opinion of the chief officer of the Pomaron that the collision would have happened if neither vessel had not changed. But we cannot accept his testimony on the point as conclusive. He estimated that the Alleghany was making 13 knots, and this according to his report to the Board of Trade was a knot and a half more than she was making. This would make a difference of 750 feet in the Alleghany's position in the five minutes which elapsed between the first porting and the collision.

The loss of property for which a recovery is sought was due to a collision on the high seas, in broad daylight and in clear weather, and with no other vessels about to embarrass or interfere with navigation. The two vessels involved were steamers, and therefore could be maneuvered more easily than any other kind of vessels. They were in plain sight of each other when miles apart. They nevertheless came into collision and with such force that one of them sank in a few hours,

carrying down with her the entire cargo. It is difficult to see how it all happened unless both vessels were in fault and failed to exercise reasonable care. Plain common sense constrains one to such a conclusion. To exonerate either of them under such conditions can be justified only if upon the closest scrutiny of the navigation of each vessel it can be discovered that one of them was free from all culpable blame. We have examined the evidence in the case with care, and we have not been satisfied that either one of these vessels was free from fault. The vessels that navigate the high seas, and indeed vessels that navigate inland waters, intrusted with human lives and property of great value, must be held to the strictest standards of conduct, and when they fail to observe the requirements which the maritime law of the nations has prescribed, are to understand that they must abide the consequences.

That the negligence of the Alleghany was inexcusable and even unparalleled, seemed to be admitted. The vessel was under the command of one of the best officers the Hamburg Line had in its service. But he had no idea that there was any vessel anywhere in his vicinity. And for three quarters of an hour prior to the collision there was no lookout. The owners of that vessel filed a petition for limitation of liability and surrendered the amount of the freight for the voyage.

[4] The court below assessed the Pomaron with the full loss, while stating that the case was one—

"which shows the necessity for the proposed new rule which will not hold each ship in solido, but will apportion liability according to fault."

And it was urged upon us in argument that the court erred in not apportioning the damages in accordance with the degree of fault. Attention was called to the fact that the Alleghany was a German vessel, and that her cargo, for the loss of which the suit was brought, was shipped under bills of lading issued by the Hamburg-American Line, a corporation organized under the laws of the German Empire. And as the Pomaron was a British vessel, it is said that it was the duty of the court to have taken judicial notice of the fact that by the Maritime Conventions Act (1 and 2 Geo. V. C. 57) the English rule as to division of loss by collision due to mutual fault was modified in accordance with the convention signed at the Brussels Conference in 1910. In like manner it is said that judicial notice should have been taken of section 735 of the Commercial Code of Germany of May 10, 1897, which reads as follows:

"If the collision is caused by faults of both sides, then the liability for damages, as well as the amount of the damages to be paid, depends on the circumstances, especially to what extent the collision has been caused by the prevailing fault of the members of one or the other crew."

It may be that at the time when this collision occurred the laws of Great Britain and Germany coincided in providing that the liability for damages is to be in proportion to the degree in which each vessel is in fault. If the foreign law had been pleaded and proved, and the court had assessed the damages in accordance with it, there would have been some authority for so doing. That course was adopted by the Circuit Court of Appeals in The Eagle Point, 142 Fed. 453, 73 C. C. A. 569

(1906). But in the case at bar there is nothing in the record to show the law of Germany or of Great Britain, and the court was not at liberty to take judicial notice of it. The federal courts do not take judicial notice of the laws of a foreign nation designed only for the direction of its own affairs. But it has been held that in a certain class of cases a court of admiralty has the right to take judicial notice of the law promulgated by a foreign state if it relates to general maritime law. See Talbot v. Seeman, 1 Cranch, 38, 2 L. Ed. 15; The Scotia, 14 Wall. 170, 20 L. Ed. 822; The Belgenland, 114 U. S. 355, 370, 5 Sup. Ct. 860, 29 L. Ed. 152; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. In the Talbot Case the right to take judicial notice was asserted of a foreign law, but the law was one which had been promulgated in the United States as the law of France by the joint act of that department which is intrusted with foreign intercourse, and of that which is invested with the powers of war. And the decision seems to have been based on the fact that it had been so promulgated. In the Scotia Case the court held that judicial notice might be taken of the original rules and regulations, which had been adopted by the British orders in council in 1863 and by Congress in 1864 and by more than 30 of the principal commercial states of the world, and that they might be treated as laws of the sea and of general obligation. And in the Belgenland Case the court said these rules and regulations having been, for more than 20 years, adopted by all the principal maritime nations of the world, they would be presumed to be binding upon foreign as well as domestic ships unless the contrary was made to appear. And in the New York Case the court stated it knew of no reason why the rule adopted in the Scotia Case should not be applied to the Revised International Rules and Regulations. But we do not find in any of these cases that the court has laid down the rule that it is the duty or the right of the court of admiralty to take judicial notice of local changes made in the general admiralty law by any foreign nation. On the contrary it satisfactorily appears that no such right is recognized. In the Belgenland Case the court considered the question as to the law to be applied in cases of collision on the high seas between ships of different nationalities and said:

"There can be no doubt that it must be the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted."

It added that this rule had some qualifications and among such qualifications stated:

"That if the maritime law, as administered by both nations to which the respective ships belong, be the same in both in respect to any matter of liability or obligation, such law, *if shown to the court*, should be followed in that matter in respect to which they so agree, though it differ from the maritime law as understood in the country of the forum; for, as respects the parties concerned, it is the maritime law which they mutually acknowledge."

In Liverpool Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 444, 445, 9 Sup. Ct. 469, 473 (32 L. Ed. 788) (1889) an admiralty case, the court below was asked to take judicial notice of a British statute exempting from liability for losses occasioned by the negligence of the

servants of the steamship company. The court refused to do so, and the Supreme Court sustained it in so doing and said:

"The law of Great Britain since the Declaration of Independence is the law of a foreign country, and, like any other foreign law, is matter of fact, which the courts of this country cannot be presumed to be acquainted with, or to have judicial knowledge of, unless it is pleaded and proved. The rule that the courts of one country cannot take cognizance of the law of another without plea and proof has been constantly maintained, at law and in equity, in England and America. * * * The rule is as well established in courts of admiralty as in courts of common law or courts of equity."

And in the case of The Scotland, 105 U. S. 24, 29 (26 L. Ed. 1001 [1881]) Mr. Justice Bradley said:

"If a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, *provided it were shown what that law was. If not shown, we would apply our own law to the case.*"

The Supreme Court, as these extracts from its opinions show, does not recognize any duty in the Admiralty Court to ascertain and apply the foreign law in fixing the liability of foreign vessels responsible for a collision where the foreign state has by statute changed the rule of the general maritime law. Such statutory limitation must be "shown" to the court and not taken judicial notice of, and it must be "shown" as any other fact is shown, by proper evidence. As the foreign law was not pleaded and no evidence of it was introduced, the court had no alternative but to follow the rule of the forum.

We do not wish, however, to be understood as intimating in what we have said that, even if the foreign law had been pleaded, the court could have assessed the damages according to the principle adopted by statute in Great Britain and in Germany. Whether it could or could not have done so is not now before us. And we do not find it necessary under the facts disclosed in the present record to consider how the decision of the Supreme Court in The Oceanic Steam Navigation Co., Limited, v. Mellor, 233 U. S. 718, 34 Sup. Ct. 754, 58 L. Ed. 1171, announced May 25, 1914, affects the question.

Decree affirmed.