## THE BINGHAMTON (three cases).

## THE SAGUA.

(Circuit Court of Appeals, Second Circuit.  January 19, 1921.)

No. 109.

1. **Collision ☞38, 76—Burdened vessel in fault.**
   One of two crossing vessels *held* solely in fault for a collision at sea, where, although the burdened vessel, she continued her course and speed until collision, and gave no signal of her intention to cross ahead until too late for the other vessel to avoid the collision. The privileged vessel *held* not in fault for keeping her course and speed until one minute before collision, where until that time the other vessel could have avoided the collision by porting, and had given no indication that she would. fail in her duty.

2. **Collision ☞38—Duty of privileged vessel to keep her course and speed.**
   Under article 21 of the International Rules, it is the duty of the privileged of two crossing vessels to keep her course and speed until a depar-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ture from the rule is necessary to avoid immediate danger, and the fact that subsequent events show that her sooner stopping and backing would have avoided collision does not prove negligence.

Appeal from the District Court of the United States for the Southern District of New York.

Suits in admiralty for collision by the Czarnikow-Rionda Company, by the Sibiria Steamship Corporation and another, and by the Warner Sugar Refining Company against the steamship Binghamton, the Binghamton Steamship Company, Incorporated, claimant, and by said claimant and others against the steamship Sagua, claimed by the Sibiria Steamship Corporation. Decree holding both vessels in fault, and both claimants appeal. Modified, by discharging the Binghamton from all liability.

Certiorari denied, 254 U. S. ——, 41 Sup. Ct. 377, 65 L. Ed. ——.

Appeals by claimants of both steamships from decrees in admiralty holding both the Sagua and Binghamton at fault for a collision which resulted in injuries to both vessels and loss of much cargo on the Sagua. On the night of March 18-19, 1917, the Binghamton, light, was proceeding from Boston to Norfolk, steering southwest; at the same time the Sagua, laden with a cargo of sugar, was on a voyage from Cuba to New York, steering for some time before collision N. 8° E. Both steamers were making about 10 knots, and both expecting to pass close to the Barnegat gas buoy. Neither had any difficulty in seeing this buoy; the night being clear, or "pretty good" for seeing lights. The wind was fresh, perhaps a "moderate gale," from the northwest, and the sea rough—rather "choppy."

The engineers on both vessels noted the shock of collision at 2:25 a. m. The Sagua probably made this notation more accurately, because her engineer felt the shock without any previous warning of danger or any suggestion of coming difficulty. Down to the moment of collision the Sagua's engines were at "full ahead," while those of the Binghamton were ordered "full astern" at 2:24 and were going astern at collision. Consequently the engineer of the Binghamton only estimated the moment of contact at about a minute after the order astern. Certainly at collision the Binghamton was still forging strongly ahead, and she struck the Sagua abaft amidships on the starboard side, and almost at right angles, with sufficient power to cut in about 15 feet.

The District Court held the Sagua liable because, being the burdened vessel, she failed to keep out of the Binghamton's way, and similarly held the Binghamton because (1) "she stubbornly held her course into collision," and (2) the watch officer, seeing that the Sagua was approaching in defiance of rule, left the pilot house and called the captain, who instantly came out, saw collision to be probably inevitable, and ordered the engines full astern. The captain's bed was about 17 feet from the wheel in the pilot house; his room being separated from the pilot house by a bathroom only. The estimated time required to bring him out was 10 or 12 seconds. He was called from the bathroom door.

From decrees according to the above findings, both claimants appealed.

Barry, Wainwright, Thacher & Symmers, of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (Edward E. Blodgett, of Boston, Mass., and James K. Symmers, of New York City, of counsel), for the Binghamton.

George Whitefield Betts, Jr., and Robert McLeod Jackson, both of New York City, for the Sagua.

J. M. Richardson Lyeth, of New York City, for Czarnikow-Rionda Co.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for Warner Sugar Refining Co. Hunt, Hill & Betts, of New York City, for Sibiria S. S. Corporation.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Several matters discussed at bar were passed on in the trial court in a way satisfactory to us. Thus we hold with the court below that the Binghamton down to the moment of collision was pursuing a substantially steady course; she did not change her course in the manner contended for by the Sagua's watch officer.

Again, the Binghamton's colored lights plainly complied with the law, for they were seen much further than the statutory distance. Nor were these lights obscured in any manner contributing to collision. This is sufficiently proven by the fact that the Sagua saw the Binghamton's running lights in plenty of time to keep out of her way.

Finally, it is unnecessary to discuss the fault of the Sagua further than was done below. Everything that that vessel did grew out of the singular belief of her second officer (who was in command when the Binghamton's lights came in view) that in the neighborhood of Barnegat buoy he had the right of way, because he was bound for New York.

The debatable part of this appeal lies within a narrow compass. The Binghamton was the privileged vessel; she watched the Sagua, and saw that that vessel was steadily getting closer on her port bow. The Sagua was the burdened vessel, and ought to have seen, but did not, that she was as steadily closing in on the Binghamton, which was plainly on a crossing course and on the Sagua's starboard bow.

The first and only sound signal from the Sagua to the Binghamton was one of two whistles blown about a minute before collision. As the Sagua was then going at full speed, and so continued into collision, she must have been at the moment of giving this signal about 1,000 feet from the place of contact.

The watch officer of the Binghamton had gone to call his captain long enough before the Sagua blew these two whistles so that the captain came into the pilot house and blew a succession of sharp blasts on his own whistle, which (as we find) were coincident with the Sagua's two whistles, and prevented those on the Binghamton from hearing the same. Contemporaneously with blowing these sharp blasts the Binghamton reversed her engines full speed. This was at least a minute before collision, and when the Binghamton was also about 1,000 feet from the point of contact. These are the facts, as we find them, raising the question of law whether the privileged Binghamton held her course and speed too long.

[2] The statement or wording of the rule can no longer be questioned in this court. It is the duty of the privileged vessel to keep "on her course until a departure is necessary to avoid immediate danger," and the rule as to speed is the same as that regarding the course. Yang-Tsze Ass'n, etc., v. Furness, 215 Fed. 859, 861, 132 C. C. A. 201, certiorari dismissed 242 U. S. 430, 37 Sup. Ct. 141, 61 L. Ed. 409.

The fact that subsequent events show that stopping and backing on the part of the privileged vessel would have avoided collision does not prove negligence. The Musconetcong, 255 Fed. 675, 677, 167 C. C. A. 5.

This is no more than the rule of The Delaware, 161 U. S. 4, 16 Sup. Ct. 516, 40 L. Ed. 771, enforced in this court in The Chicago, 125 Fed. 712, 60 C. C. A. 480. It may be pointed out that the Chicago, like the Sagua, blew a two-whistle signal when to do it was almost criminal. This signal was not heard by the City of Augusta (like the Binghamton), but nevertheless it was at that moment that the City of Augusta reversed her engines. It was in such a case (so singularly like the one at bar) that (quoting from the Delaware) we held that the privileged—

"steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty."

In the same opinion we sufficiently differentiated the Supreme Court decisions relied upon or referred to by the Sagua, viz.: The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, and The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751. See also The Cygnus, 142 Fed. 85, 73 C. C. A. 309.

Thus the question must always become one of fact, and as has been pointed out (The Haida [D. C.] 191 Fed. 623, affirmed 196 Fed. 1005, 115 C. C. A. 376):

"It must always be a close question when the time comes at which the burdened vessel can by no possibility do her duty, and that time is doubly hard for the privileged vessel to find, for she has no right to change her course and speed until then."

The present case comes down to two questions: (1) Should the Binghamton have stopped and reversed her engines before the Sagua blew two whistles? (2) Was the reversing of the Binghamton delayed by the act of her second officer in going for the captain?

The Sagua was a quick-steering vessel, and under the wind and weather conditions of that night she would go over to her own starboard hand with great rapidity. If she had done this at the very moment that the two whistles were blown, we think she would have succeeded in clearing the Binghamton, if the latter vessel had maintained her course and speed. If this be true, then, under the cases already cited any change of course or diminution of speed by the Binghamton would have been a fault, and she cannot be condemned for abstaining from a fault.

We find it shown by a fair preponderance of evidence that the Sagua could have obeyed the rule until she blew those two whistles. But, further, the Sagua is affected by that other rule established by the same cases, viz. when her own fault is so gross and so plainly shown as it is here, it is incumbent upon her to prove affirmatively and conclusively the fault of the other vessel.

The decrees appealed from are modified, by discharging the Binghamton from all liability, with costs in both courts.