## THE BOSTON.[*]

### THE RICHMOND.

(Circuit Court of Appeals, Second Circuit.  November 16, 1921.)

Nos. 16, 17.

**1. Collision ⬅93—Evidence held to justify finding of fault.**

In libel by owner of steamer against owner of ferryboat, arising out of a collision when the latter attempted to cross the bow of the former, evidence *held* to justify a finding that the ferryboat was gravely at fault, and that she attempted to navigate without regard to the rights of the steamer, which was the privileged vessel under Pilot Rules, art. 19, providing that, when two steam vessels are crossing, the vessel having the other on her starboard side shall keep out of the way.

**2. Collision ⬅38—Duty of privileged vessel to hold her course.**

When two steam vessels are crossing so as to involve risk of collision, it is not only the right, but the duty, of the privileged vessel, under Pilot Rules, art. 19, to hold her course and speed until a departure from the rule is necessary to avoid immediate danger, and the fact that subsequent events show that stopping and backing on the part of the privileged vessel would have avoided collision does not prove negligence.

**3. Collision ⬅38—Duty of privileged vessel to assist maneuver assented to.**

Where privileged vessel, under Pilot Rules, art. 19, giving a steam vessel to the starboard of another the right of way, assents to proposal of the other to cross her bow by repeating two whistles, it is her duty to at once assist the maneuver.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 256 U. S. —, 42 Sup. Ct. 314, 66 L. Ed. —.

**4. Collision ⬷153—Claim of fault, not suggested below, not reviewed on appeal in collision case.**

On appeal from a decree in a proceeding in admiralty to determine who was at fault in a collision between steamers, it cannot be claimed by appellant for the first time on appeal that the other vessel was at fault, in that she was navigating in violation of Consolidation Act N. Y. § 757, requiring steamboats to be navigated as near as possible to the center of East River.

Appeals from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the New England Steamship Company, owner of the steamer Boston, against the City of New York, owner of the ferryboat Richmond, with cross-libel by the libelee. Decree for the former, and the latter appeals. Affirmed.

John P. O'Brien, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. These causes were tried together in the court below, were argued together in this court, and will be decided in a single opinion.

The New England Steamship Company, a corporation organized under the laws of the state of Connecticut, as the owner of the steamer Boston filed its libel against the city of New York, owner of the ferryboat Richmond in a cause of collision, civil and maritime. The libelant complained that on December 12, 1917, the steamer Boston, being at the time seaworthy and properly manned and equipped, left New Bedford, Mass., bound for Pier 40, North River, on one of her regular trips; that when the Boston arrived in the vicinity of the Battery in New York Harbor at about 6:30 a. m., on the morning of December 13, 1917, the municipal ferryboat Richmond, was observed one-half to three-quarters of a mile away and about one and one-half or two points off the Boston's port bow; that the ferryboat was just coming from behind Castle William on Governors Island and was showing her green light; that the Boston immediately gave the ferryboat a one-blast signal; that the ferryboat did not answer this signal, but shortly thereafter the ferryboat gave a two-blast signal, indicating that she was going to cross the Boston's bow; that, realizing that this was a dangerous maneuver for the ferryboat to attempt, those in charge of the Boston immediately stopped her engines, had them put full speed astern, and at the same time blew three whistles; that they then blew the danger signal, and the Boston's wheel, which had been to port, was put hard astarboard, in an attempt to swing the bow to port and avoid a collision; that the ferryboat made no maneuver to avoid the collision, but continued ahead across the course of the steamer, and the Boston's bow came in contact with the Richmond's starboard side, about 40 or 50 feet from her stern, resulting in the stem of the steamer being badly damaged.

⬷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The city of New York in its answer alleged that at 6:10 a. m. on December 13, 1917, the municipal ferryboat Richmond left Staten Island on her regular trip, bound for her slip at the foot of Whitehall street, borough of Manhattan, city of New York; that when she arrived about off the castle on Governors Island, some time about 6:30 a. m., a steamer, which afterwards proved to be the Boston, was observed coming down the East River, about 1,000 feet off the Manhattan shore and about a half a mile away; that the Richmond immediately blew a two-whistle signal, thereby requesting permission to go ahead of the Boston in order to make her slip; that the Boston immediately answered with a two-whistle signal; that the Richmond thereupon proceeded to cross the bow of the Boston in accordance with the two-whistle agreement; that after proceeding for about 20 seconds, and when the Richmond had gotten within about 450 feet of her slip, her captain, noting that the Boston was navigating rather close, blew the Boston a second two-whistle signal, which signal was immediately answered by two whistles from the Boston; that the Boston, however, failed properly to navigate in accordance with the said whistle agreement, with the result that, while the Richmond was attempting to enter her slip and was within 300 feet thereof, the Boston struck her about 40 feet from the stern on her starboard aft quarter.

The answer charged negligence on the part of those in charge of the Boston in the following particulars:

(1) In that the said steamship Boston was navigating too close to the piers.

(2) In that the said steamship Boston failed to abide by a whistle agreement.

(3) In that the said steamship Boston failed to keep out of the way of the Richmond, when the ferryboat was attempting to make her slip.

(4) In that the said steamship Boston, when danger of collision was imminent, did nothing to avoid it.

(5) In that the steamship Boston was in charge of an incompetent master and crew.

(6) In that the said steamship Boston was negligent in such other and further respects as will be pointed out at the trial.

The city of New York also filed a cross-libel against the New England Steamship Company, as the owner of the steamer Boston, in which it alleged that the collision was due to the negligence of those in charge of the Boston in the particulars stated in the answer to the libel filed against it by the New England Steamship Company, as already recited, and sought to recover for the damage done to the Richmond, which it alleged was in the sum of $5,250, and also sought to recover for the loss of the use of the vessel while undergoing repairs, and for expenditure for surveyors' fees and other charges.

The District Judge accepted in the main the claim made by the steamer Boston, which he held to be the privileged vessel. He found the collision took place at least 600 feet from the pier ends, and that the Richmond "was gravely at fault" and "had attempted to navigate without regard to the rights of the Boston." He declined to find the Boston in fault, especially in view of what he regarded as "the glaring

faults" of the Richmond, and a decree was entered against the city of New York for the sum of $21,745.43, with interest. The cross-libel was dismissed.

The testimony shows that the Boston had the Richmond on her port side and that the vessels were on crossing courses. Article 19 of the Pilot Rules provides that—

"When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

And article 21 provides that, where one of the two vessels is to keep out of the way, the other shall keep her course and speed. Under these rules the Boston was entitled to keep her course and speed, and the Richmond was the burdened vessel, and should have passed under the stern of the Boston. When the Boston discovered the Richmond, she blew a one-whistle signal, indicating an intention to hold her course and speed; the Richmond being at the time about half a mile away. The Richmond continued ahead, going at full speed, and when about 800 feet away blew two whistles, indicating an intention to cross the bow of the Boston. Thereupon the Boston, according to the testimony of her captain, answered with two whistles, and then stopped and backed under a full-speed order, and blew three whistles to notify the Richmond that the Boston was backing, and then blew the danger signal. The wheel of the Boston was also put astarboard. The captain of the Boston was asked why he blew the two whistles. He answered:

"Well, we were so close together, to let her know that I had heard him, and was going to do everything possible to let him get by. I said: 'By golly! She is going to cross our bow.' She couldn't do anything else then, because she was close to us, and she couldn't do anything but go across the bow. She was going ahead quite strongly at that time."

Again, on the cross-examination, he was asked the purpose of his blowing the two-whistle signal to the Richmond, and he replied:

"I knew she was determined to go across my bow, because she couldn't do anything else, and I answered to let her know that I heard her two whistles, and immediately blew her three, to let her know that I was backing."

The vessels collided, the Boston striking the Richmond about 40 or 50 feet from her stern on the starboard side. The following is a further excerpt from the testimony of the captain of the Boston:

"Q. Did the Richmond blow alarm whistles? A. I didn't hear her; no, sir.
"Q. Didn't she do anything to avoid collision? A. Not that I could see. * * *
"By the Court: Q. She had slackened her speed, had she not? A. Not until after she hit us, I don't think she did; I don't think she slowed up a bit, because she was going quite fast."

At the time this collision occurred there were no other vessels near enough to interfere in any way with the navigation of either boat.

[1] This case was very carefully considered by the court below. The District Judge, who heard and saw the witnesses, was in a position to decide between the conflicting stories, and we see no reason for thinking that he was mistaken in the conclusions at which he arrived

as to the facts. The testimony seems to us amply to justify the finding that the Richmond was gravely at fault, and that she attempted to navigate without regard to the rights of the Boston, which was the privileged vessel.

The Richmond had no proper lookout. If she had had such a lookout, those in charge would have known of the presence of the Boston long before they did. It appears from the testimony of the captain of the Richmond that he was not aware of the Boston's presence until he was midway between Castle William and the Ellis Island slip. He did not discover her until he had traveled fully half of the distance from the point where he should have first observed her to his destination. The Richmond was so occupied in cutting across the bow of Transfer No. 25 that she paid no attention to the Boston. Then her captain blew two whistles to the Boston, and proposed to cut across her bow, instead of passing under her stern, as the rules of navigation require.

The Richmond, in proposing to cut across the bow of the Boston and insisting upon it, assumed the risk of what the court below properly characterized as "an obviously hazardous and wholly unnecessary navigation, which could have been dictated only by an obstinate insistence upon some supposititious right of a ferryboat to disregard the steaming rules." And the proposal was made at scarcely more than 40 seconds from the point of meeting of the vessels, while she was approaching at top speed. See The Binghamton (C. C. A.) 271 Fed. 69, 72; The Persian, 224 Fed. 441, 140 C. C. A. 135.

[2] It is argued that the Boston was at fault, inasmuch as, after the Boston blew her one-whistle signal, indicating her intention to keep her course and speed as the privileged vessel, continuing under a one-bell signal right up to within 600 feet of the Richmond, she doggedly claimed her privilege." But until she had consented to surrender her privilege she had a right "doggedly" to claim it, until it became evident that the Richmond was not going to obey the rules of navigation, and that it was necessary to do something to avoid collision. It is not only the right, but the duty, of a privileged vessel to hold her course and speed until a departure from the rule is necessary to avoid immediate danger. The Binghamton (C. C. A.) 271 Fed. 69; Yang-Tze Ass'n, etc., v. Furness, 215 Fed. 859, 132 C. C. A. 201. And, as was said in The Binghamton, supra, the fact that subsequent events show that stopping and backing on the part of the privileged vessel would have avoided collision does not prove negligence.

[3] It was, however, a most serious question whether, after the Richmond made her first proposal to cross the Boston's bow, the latter assented to the proposal, or whether her assent was withheld until the Richmond renewed the proposal by a repetition of the two whistles. The District Judge had some considerable doubt as to whether the Boston ever answered the first signal. Of course, if she did assent to the proposal when first made, it would have been her duty at once to have assisted the maneuver. But the District Judge was not satisfied that she did assent to the proposal when first made, and we are not disposed to set aside his findings. The captain of the Boston seems

to us to have exercised his best judgment, and we think the court below was justified in its findings of fact, and committed no error of law upon which we can reverse.

[4] We ought, perhaps, to add that the appellant claimed in this court that the Boston was in fault in that, at the time of the collision, she was navigating in violation of what is known as the East River statute. Consolidation Act N. Y. (Laws 1882, c. 410) § 757. That statute requires that all steamboats passing up and down the East River, between the Battery and Blackwells Island, shall be navigated as near as possible in the center of the river, except in going into or out of the usual berth or landing place of such steamboat, and shall not be propelled at a greater rate of speed than 8 miles an hour below Corlear's Hook, nor 10 miles an hour above Corlear's Hook. See New York Central Tug No. 17, 256 Fed. 220, 167 C. C. A. 436. And, as the court below found that the collision occurred approximately 600 feet from the pier ends, the Boston could not have been navigating according to the rule. It is claimed, therefore, that, as the vessel was navigating in violation of the statute, the burden was on the Boston to show that such violation did not contribute to the collision. Inasmuch as no such claim of fault was suggested at the trial in the court below, and is not assigned as error, it is not properly before us on the appeal, and in accordance with our recent decision in The Plymouth, 271 Fed. 461, we must disregard it. And see The Minnie, 225 Fed. 36, 140 C. C. A. 362; The Philadelphia, 75 Fed. 684, 21 C. C. A. 501; Tow Boat No. 1, 74 Fed. 906, 21 C. C. A. 169; Brauer v. Compania Navigacion la Flecha, 66 Fed. 776, 14 C. C. A. 88.

Decree affirmed.