UNITED STATES of America, owner of the U.S.S. SARATOGA (CVA 60), Libelant,

v.

M/V BERND LEONHARDT, her engines, boilers, tackle, etc., and Partenreederei M.S., owner of the M/V Bernd Leonhardt, Respondent.

PARTENREEDEREI M.S. BERND LEONHARDT, owner of the M/V Bernd Leonhardt, Cross-Libelant

v.

UNITED STATES of America, Cross-Respondent.

No. 4181.

United States District Court D. Maryland.

May 13, 1965.

Thomas J. Kenney, U. S. Atty., Baltimore, Md., Alan Raywid, Bertram E. Snyder, Dept. of Justice, Washington, D. C., for the United States.

William A. Grimes, Randall C. Coleman, Ober, Williams & Grimes, Balti-

more, Md., for respondent and cross-libelant.

NORTHROP, District Judge.

The USS SARATOGA and the German Motor Vessel BERND LEONHARDT collided thirty-three miles off the outer banks of North Carolina just after midnight on the twenty-fifth of May, 1960. The United States as owner of the SARATOGA filed a libel against the Motor Vessel BERND LEONHARDT and her owners, Partenreederei M.S. and the latter have cross-libeled.

The USS SARATOGA is one of the largest vessels afloat. She is a steel-hulled aircraft carrier, 1046 feet in length with a beam of 130 feet and a light displacement tonnage of 56,000. She has great maneuverability and a capability of speed of over 30 knots. The BERND LEONHARDT is a motor-driven steel, combination cargo-and-ore vessel of 6,135 gross tons, and has a length of 485 feet, 1 inch, with a beam of 74 feet, 10 inches. She has a single screw and when unladen is capable of a speed of approximately 14 knots.

The BERND LEONHARDT was out of Trinidad bound for Baltimore; the USS SARATOGA was steaming south for maneuvers off of Florida, having taken on ammunition at the Navy Yard at Hampton Roads, Virginia.

There is no dispute that both vessels were properly lighted, the sea was calm with slight swells, visibility was excellent and the wind out of the southwest at force 2. The weather was clear both at the time of the collision and for some time preceding it. And, most importantly, from the time the ships first sighted one another on the horizon at some 10 to 12 miles distance, the BERND LEONHARDT was the burdened vessel.

Unless otherwise stated, distances and ranges referred to herein are nautical miles; speeds are knots, and courses and bearings, true. By agreement, all times are those of the SARATOGA based on a 24-hour clock, since time on the BERND LEONHARDT was not kept in great detail.

From the time of sighting to the collision, neither vessel changed speed and no engine orders were given.

After the collision, both vessels steamed independently: the SARATOGA to the Navy Yard at Hampton Roads and the BERND LEONHARDT to Baltimore. Proctors then commenced to take statements, file libels, amass evidence and take depositions. A Navy Board of Inquiry was convened and testimony taken in Norfolk; later, in West Germany another inquiry was held. In addition to numerous witnesses and exhibits produced at trial before this court, naval experts testified on behalf of each vessel, attempting to pinpoint the fault as to how in the world large vessels, far out in the ocean with the weather and sea calm and visibility at a maximum, can collide.

COURSES TO COLLISION

When the SARATOGA first sighted the BERND LEONHARDT on the horizon her course was 174° and her speed 26. Both her Combat Intelligence Center and her Commanding Officer's Tactical Plot Log indicate picking up the BERND LEONHARDT at about 2344 to 2343 hours respectively, range varying 10.5 to 11, bearing 171° to 170°, and her speed calculated at 11, with the time of the closest point of approach constant at 0001 hours. The information transmitted from the bridge and signal bridge on visual sighting, indicated two white lights and a green one. At 2348 hours, the SARATOGA came to course 190°. Seven minutes later, or at 2355, she started a turn to 165° but instead steadied on 170° at about 2356. Her course was then changed to 160° at 2358. At 2359 she was ordered port to 150°, but no evidence was introduced as to whether or not she ever steadied on that course. At 000½ hard right rudder was ordered. This was followed almost immediately at 0001 by a hard left order. On impact, rudder was ordered amidships.

According to her testimony, the BERND LEONHARDT first sighted the SARATOGA about 20 to 25 minutes before collision, 3 to 4 points off her starboard bow, approximately 10 to 12 miles

away. The BERND LEONHARDT was then on course 330°. At around 2358 the BERND LEONHARDT went starboard either to 360° or to 010°. There is no evidence as to how far she actually altered course. The order was "right rudder" and no observation of the compass was made. Hard right rudder was ordered just before collision.

The point of collision was plotted at 36°15.5′ latitude north and 75°.05′ longitude west. The port side of the BERND LEONHARDT scraped down the side of the SARATOGA seriously damaging her port flight deck. The port wing of the BERND LEONHARDT's bridge was demolished.

### BREACH OF DUTIES CHARGED

The BERND LEONHARDT accuses the SARATOGA of:

1. Violating International Rule 21,[1] 33 U.S.C.A. § 146e, specifically that the SARATOGA, being privileged, failed to maintain her course and speed in persisting to turn to port; and

2. Failing to give whistle signals as to any of her course changes, in violation of Rule 28 [2] of the International Rules, 33 U.S.C.A. § 147(a).

The latter is not seriously urged.

The SARATOGA assigns the following breaches to the BERND LEONHARDT:

1. Violation of International Rule 19,[3] 33 U.S.C.A. § 146c, for failure to keep out of the way.

2. Violation of International Rule 22,[4] 33 U.S.C.A. § 146f, in crossing ahead the bow of the SARATOGA.

3. Violation of International Rule 23,[5] 33 U.S.C.A. § 146g, for failing in her duty to slacken speed or reverse.

4. Violation of International Rule 28,[6] 33 U.S.C.A. § 147(a), in not sounding signals indicating course change, specifically one short blast signifying, "I am altering my course to starboard".

5. Violation of International Rule 29,[7] 33 U.S.C.A. § 147a, in failing to take additional precautions generally, or specifically in neglecting to keep proper lookout.

1. "§ 146e. Vessels having right of way; duty in aiding to avert collision (Rule 21)

"Where by any of sections 146—146k of this title one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 146k and 147a of this title). Oct. 11, 1951, c. 495, § 6, Part C, 65 Stat. 418."

2. "§ 147. Sound signals indicating course (Rule 28)—Meaning of blasts

"(a) When vessels are in sight of one another, a power-driven vessel under way, in taking any course authorised or required by sections 144—147d of this title, shall indicate that course by the following signals on her whistle, namely:—

"One short blast to mean 'I am altering my course to starboard.'

"Two short blasts to mean 'I am altering my course to port.'

"Three short blasts to mean 'My engines are going astern.' "

3. "§ 146c. Power-driven vessels crossing (Rule 19)

"When two power-driven vessels are crossing, so as to involve risk of collision,

the vessel which has the other on her own starboard side shall keep out of the way of the other. Oct. 11, 1951, c. 495, § 6, Part C, 65 Stat. 418."

4. "§ 146f. Crossing ahead of vessel having right of way (Rule 22)

"Every vessel which is directed by sections 146—146k of this title to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other. Oct. 11, 1951, c. 495, § 6, Part C, 65 Stat. 418."

5. "§ 146g. Duty to slacken speed, stop or reverse (Rule 23)

"Every power-driven vessel which is directed by sections 146—146k of this title to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse. Oct. 11, 1951, c. 495, § 6, Part C, 65 Stat. 418."

6. See Note 2.

7. "§ 147a. Additional precautions generally (Rule 29)

"Nothing in sections 144—147d of this title shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect

Before assigning fault in detail, two crucial facts must be determined by this court:

1. The speed of the BERND LEONHARDT; and

2. The time the BERND LEONHARDT made her first turn to starboard for a port passage.

The BERND LEONHARDT vigorously contends that her speed was 12½ knots and could not have been any greater. The testimony favoring this contention is as follows:

1. The BERND LEONHARDT was heavily laden with ore.

2. The calculations on the BERND LEONHARDT's navigational chart show:

a. From 2100 to 2200 she traveled only 11.3 nautical miles;

b. From 2000 to 2200 she traveled 24.8 nautical miles, making her average speed 12.4; and

c. From 2000 to 2230 she traveled 30 nautical miles, making her average speed 12.0.

3. The estimates made on board the SARATOGA:

a. The Deck Officer's calculation of the BERND LEONHARDT's speed at between 11 and 12; and

b. The calculations of both the CIC and COTP estimating the BERND LEONHARDT's speed at 11.

Against these various estimated speeds are the BERND LEONHARDT's answers to interrogatories estimating her speed to collision at 13 knots; on deposition her chief engineer estimated 13.8 based on engine revolutions; the chart in use for more accurate navigation entries—off the beam—shows 13.5 knots; calculations from the recorded radar positions aboard the SARATOGA indicate 14.1 knots; and the northern flow of the Gulf Stream would have increased the BERND LEONHARDT's speed. Further, the BERND LEONHARDT's ex-

pert's mathematical computations and charts, if extended to collision, which he did not do, would indicate a speed greater than the 12½ knots used by him in propounding his theories. The court finds, from a preponderance of the evidence, that the speed of the BERND LEONHARDT was in excess of 13 knots.

When did the BERND LEONHARDT make her first starboard turn? Only the testimony of the BERND LEONHARDT's third mate Grope places it before 2358. His testimony is that the turn was made 4 to 5 minutes before the collision time of 0001. The SARATOGA's Officer of the Deck, while not absolutely certain, places the turn at 2358. The BERND LEONHARDT's expert places it at 2358. The SARATOGA's log entries indicate the turn commenced some time after 2358½. These entries, indicating her response to the BERND LEONHARDT's movements, show an order at 2359, "Steady on 160°(T) P.G.C. Continue left to 150°(T) P.G.C." and "Hard right rudder" at 000½. When the BERND LEONHARDT commenced her turn she was on 330°. Upon right-rudder order, it is variously stated that she came to 360° or 010°. The BERND LEONHARDT turns slowly, 35 seconds for the first 10° to the right and 12.5 seconds for each succeeding 10°. So, it would take approximately a minute before her turning could be perceived.

As the BERND LEONHARDT was under continuous observation, the above entries substantiate that her first starboard turn was discerned some time after 2359.

The court concludes then that the weight of the testimony clearly indicates the first starboard turn of the BERND LEONHARDT to have commenced seconds after 2358½.

FAULT: THE BERND LEONHARDT

The watch officer on the bridge of the BERND LEONHARDT was the third

of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

Oct. 11, 1951, c. 495, § 6, Part D, 65 Stat. 419."

mate, Grope, then 22 years of age. He had been licensed as an officer in January of 1960 and signed on the BERND LEONHARDT in February of that year. While he had been at sea for 5 years, this voyage was his first as a deck officer. With him as lookout was 19-year-old ordinary seaman Jungnickel. The ship was on automatic pilot, course 330°, when the lookout reported sighting the SARATOGA. The mate had already seen her lights and concluded that she was privileged. He then took what he described as a double bearing, but made no record of it other than to believe the SARATOGA stood 3 to 4 points off his starboard bow. Shortly thereafter, he received a flashing signal from the SARATOGA, "What ship?" Before replying he took another bearing; then he directed ordinary seaman Jungnickel to take the helm. No course change or engine orders were given. There is conflict as to the time when these events took place, but not as to their sequence. Nevertheless he finally did reply, "BERND LEONHARDT from Trinidad to Baltimore". There is also dispute as to how long this reply took. He then took another bearing which indicated the SARATOGA had moved somewhat to the BERND LEONHARDT's port, but was still in a crossing situation. He did see the SARATOGA's red port light, but he was confused as to whether he saw one or two white lights (range or mast). In addition, he stoutly maintained that a crossing situation existed, and that he firmly believed he was obliged to make a port-to-port passage, and I find as a fact that he did so believe. At no time after the first sighting did he estimate the range of the SARATOGA. More significantly, after the final bearing taken subsequent to his signaling, he ordered right rudder. Neither he nor the helmsman know how far she turned before his final order, but this change was from 330° and was made at approximately 2358½. At the time Grope did not know the bearing of the SARATOGA nor her range, nor how the BERND LEONHARDT lay with respect to the SARATOGA's bow. Repeated questioning, however, produced testimony that he felt her range was sufficient to carry out his obligation of a port-to-port passage. He further testified that he believed the passage would be at such a distance that a whistle signal —which, he testified, could be heard at a distance of 3 miles—could not have been heard by the SARATOGA.

Grope never took the trouble to make the necessary calculations to confirm his estimate of the distance between the vessels: he was deposed on June 1, 1960, just after the collision; he could not then give an estimate of the SARATOGA's range nor where the BERND LEONHARDT lay in relation to the SARATOGA's bow. At trial, Grope referred to a change of the SARATOGA from between 3 and 4 points to 2 points off his starboard bow. But he stated that he was not positive of this change; and if indeed he ever did observe it, it did not alert him to the danger of impending collision. Further reiterating, Grope testified that before he made his first starboard turn, at approximately 2358½, he believed he saw the SARATOGA turn to port. His testimony here substantiates the time he actually ordered his turn, since the SARATOGA's log shows a command to port 160° at 2358.

Grope then estimated the situation to be that the BERND LEONHARDT was still burdened, though "lightly", and that therefore he would proceed to carry out the obligation to make a port-to-port passage. In these observations and the conclusions he drew therefrom, Grope was greatly mistaken and the BERND LEONHARDT was, therefore, grossly at fault. For at this time, with a closing speed of 39 knots or slightly over, the vessels were within 1½ miles of each other and by the BERND LEONHARDT's turn, were again brought to collision course.

Up to this crucial period Grope had made no calculation of the SARATOGA's speed nor of her range since his first sighting at 10 to 12 miles. Even if we

adopt the testimony of the BERND LE-ONHARDT's expert that the SARATO-GA's port turn at 2355 (in order to resume her original track of 170°) and then to 160° at 2358 caused the BERND LE-ONHARDT to appear on the SARATO-GA's starboard bow, Grope was still grossly at fault for not perceiving his position off the SARATOGA's starboard bow before commencing his own turn to starboard. By all calculations Grope was in a position to see the loom of the SARATOGA; yet even so his seaman's eye did not assist him. Captain Stammel testified that after the collision he clearly saw the SARATOGA's loom as she stood to at what he estimated to be 2 miles or more, and he recognized her as a carrier.

It must be repeated for emphasis: Grope understood the SARATOGA to be privileged and he therefore considered he was making a routine passage at all times. The SARATOGA's course changes from 174° to 190° at 2348 and back to 170° at 2355 were, for whatever reason, never observed by him.

■ The court finds these course changes of the SARATOGA to be too remote in time, degree and distance to have affected the relative positions of the vessels. United States v. S. S. Malden, 224 F.Supp. 705 (E.D.Va.1963), affirmed United States v. Massachusetts Trustees, etc., 341 F.2d 292 (4 Cir. 1965); United States v. S.S. Soya Atlantic, 213 F.Supp. 7 (D.Md.1963), affirmed 330 F.2d 732 (4 Cir. 1964); The Steel Inventor, 43 F.2d 958 (2 Cir. 1930).

■ Even the SARATOGA's change to 160° at 2358 did not cause Grope to re-appraise his original concept of his duty under the rules. Hence, I find that the BERND LEONHARDT was grossly at fault and violated her obligation both under International Rule No. 19, to keep out of the way, and under International Rule No. 22, by crossing ahead, for I have found that the BERND LEON-HARDT was on the starboard side of the SARATOGA prior to the "right rudder" order issued at approximately 2358½. The BERND LEONHARDT, the burdened vessel in this crossing situation, failed properly to observe the SARATOGA, the privileged vessel. She violated her duty under Rule 29 of the International Rules, 33 U.S.C.A. § 147a which provides in pertinent part:

"Nothing [in these Rules] shall exonerate any vessel * * * from the consequences * * * of any neglect to keep a proper look-out."

Ordinary seaman Jungnickel was ordered to the helm when Grope began signaling the SARATOGA and he remained there until the collision. His testimony is that from just after the first sighting, he observed nothing else as he was constantly watching the helm. During this time, Grope continued his signaling. Yet he recorded none of his observations, and he could not remember, either just after the collision or at the trial, having made any judgments as to his relative position with reference to the SARATOGA or her range. All facts before me indicate a gross misjudgment, at least, as to the SARATOGA's range.

■ The required proper lookout, who would have pertinent information regarding the position of the privileged vessel, was totally lacking here. Such a requirement was not satisfied by the presence of the mate on watch or the helmsman in the wheelhouse. Griffin on Collision, p. 273; The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165 (1866); The George M. Dallas, Fed.Cas. No. 5,338 (1856); The Orion, 26 F.2d 603 (1 Cir. 1928). In Anthony v. International Paper Company, 289 F.2d 574 (1961), the Fourth Circuit held that failure to post a proper lookout imposes upon the offending vessel the burden of showing by clear and convincing evidence that it did not contribute to the collision.

■ The BERND LEONHARDT was, in this instance, in a position strikingly like that of the USS DARBY in United States v. S.S. Soya Atlantic, supra. The DARBY had an incompetent lookout. The BERND LEONHARDT had none. The DARBY's bridge watch misjudged

her distance from the SOYA ATLANTIC; the BERND LEONHARDT likewise misjudged the range of the SARATOGA. Thus, the court finds the BERND LEONHARDT at fault in violating International Rule No. 29.

■ The BERND LEONHARDT failed to sound one blast as she commenced her starboard turn, in violation of International Rule 28, 33 U.S.C.A. § 147, providing that a vessel making a course change shall indicate that course by an appropriate blast. The testimony is clear that had the BERND LEONHARDT sounded one blast as she commenced her starboard turn, the SARATOGA would have had an extra minute in which to come right and thereby the collision could have been avoided. The BERND LEONHARDT has failed to show, as she must under the "Pennsylvania Rule" that this breach could not have contributed to the collision. The testimony and circumstances are quite to the contrary: the SARATOGA had a "smart" helmsman and was a vessel of high maneuverability; and, given even seconds of extra time, she could have avoided the near miss. I therefore find the BERND LEONHARDT at fault in failing to sound one blast before turning to starboard.

■ The BERND LEONHARDT's failure to slacken speed, stop or reverse, as set out in International Rule 23, 33 U.S.C.A. § 146g, could have likewise contributed to the collision prior to her starboard turn at 2358½. Again, the BERND LEONHARDT has not shown that this statutory duty could not have contributed to the collision. Griffin on Collision, § 50(5), p. 141. Manifestly, the time of the closest point of approach would have been extended and, given the SARATOGA's correct analysis of the situation in going to port, there would have been no collision.

### FAULT: THE SARATOGA

■ The faults of the BERND LEONHARDT were grave and obvious. The court must now examine the maneuvers of the SARATOGA to determine if any of her actions in not maintaining her exact course could have contributed to the collision and thus create apportionment. Clear and convincing evidence must be found in order to make any such finding. This is a well established principle, United States v. S.S. Soya Atlantic, 330 F.2d 732, at page 740 (4 Cir. 1964).

The BERND LEONHARDT's proctors assign fault to the SARATOGA in the following respects:

1. Violation of Rule 21 in failing to keep her course; and

2. Violation of Rule 28 in failing to sound 2 blasts when she continued to go to port.

The latter charge is not seriously urged.

The SARATOGA maintained a full bridge watch: an Officer of the Deck, 23-year-old Lt. (J.G.) Allan R. Tessler; a Junior Officer of the Deck; a helmsman; a quartermaster; 3 look-outs; a signal team of 3 men; and 2 radar teams, one in the Commanding Officer's Tactical Plot (COTP) and one in the Combat Information Center (CIC). In addition, the navigator was on and about the bridge, chart house and wheelhouse. He was actually on the bridge from about 2356 hours through the time of the collision.

Those actions of the SARATOGA which are crucial—in assigning fault, if any—took place after 2355. From 2355 to 2358 this huge warship steamed at 26 knots continuing on course 170°. At 2358 her log reads "C/C to 160°(T) PGC. Left"; at 2359 "Steady on 160° (T) PGC. Continue left to 150°(T) PGC". Her log thereafter reads, at 000½, "Hard right rudder. Contact bearing 160°(T) PGC. Distance 2 miles. Stood acrossed [sic] the bow after fading from radar. Navigator assumed the conn." "0001 Hard left rudder. Collision port side. Rudder amidships. Sounded collision alarm * * *."

Both CIC's and COTP's radar reports and occasional visual reports logged as

relayed from the bridge, are of meager aid in resolving the situation.

While there is some variation in the testimony, the visual observations by all hands on the SARATOGA place the BERND LEONHARDT either dead ahead or varying degrees off the SARATOGA's starboard bow at least at 2358, and some witnesses say even 2 to 3 minutes before that time. The SARATOGA's expert, basing his computations on the testimony of all the witnesses, fixes the time of the BERND LEONHARDT's crossing at 2355½. To all, her aspect was 2 white lights, range and mast, and her green starboard light. The situation according to the watch, including the navigator who is an officer of considerable experience, was that, disregarding her burden, the BERND LEONHARDT was making a starboard passage. To widen this passage, the SARATOGA changed course to 160° at 2358 and within that minute, at 2359, ordered left to 150°. It was only after the BERND LEONHARDT presented her red port light and her range lights, by then in line, that the SARATOGA went to starboard at 000½.

David I. Pedroli, signalman, first signaled to the BERND LEONHARDT with the port flasher, but changed to the forward light because the BERND LEONHARDT had gone to the SARATOGA's starboard. From that light he signaled "Bon Voyage" as the BERND LEONHARDT was first crossing the SARATOGA's bow.

About 4 hours after the collision, Ensign William D. Thayer, a junior watch officer relaying orders to the helm, made a sketch concerning what he saw. This most convincing evidence shows clearly that the BERND LEONHARDT crossed the SARATOGA's bow from port to starboard, and commenced to recross the SARATOGA's bow. Commander Robert E. Warner, navigator of the SARATOGA came on the bridge shortly after 2355 —he estimated 2356—from the pilot room immediately behind it. His first observation was of the BERND LEONHARDT dead ahead, lower range light to

his right, higher mast light to his left, crossing from port to starboard. He went to the Officer of the Deck who told him the course of the SARATOGA was 170° and, while the navigator was there, ordered course change to 160° to widen a starboard passage. This change was logged at 2358. Commander Warner then left the steering console and started for the SARATOGA's port wing when he heard shouts that the BERND LEONHARDT was turning. When he came back to the steering console, the BERND LEONHARDT was clearly off the SARATOGA's bow relative bearing 10°. Just as the bearing was given, the aspect of the BERND LEONHARDT changed: the masthead and range lights were in line and both port and starboard running lights were visible. However, Commander Warner still thought that the BERND LEONHARDT would pass down the starboard side; then, seconds later, he observed the BERND LEONHARDT turning yet further to re-cross the SARATOGA's bow.

While there is conflict as to times and degrees, the court, considering all the testimony, finds that the BERND LEONHARDT had crossed the SARATOGA's bow some time between 2355 and 2358; when she was on the SARATOGA's starboard she turned and attempted to recross the SARATOGA's bow.

The precise point to be resolved in finding fault, if any, is did the SARATOGA violate her obligation to keep her course by going to her port at 2355 and continuing on further to port at 2358?

The SARATOGA's return to her track at 170° at 2355 is of no significance, both in time and distance, as it was 6 minutes from collision and almost 4 miles from the ultimate point of collision. United States v. S.S. Soya Atlantic, supra, and United States v. S.S. Malden, supra.

Nor, despite her contention to the contrary, was the BERND LEONHARDT misled. As Grope testified, just before he executed the starboard turn at 2358½ he "thought" the SARATOGA had come

left slightly. He also said that he believed his burden to be "light" and that he never made any estimate of the SARATOGA's range, relative position, course, speed or closing, and he failed to ascertain the latter although at 2358 she was well within 1½ miles and closing speed was over 39 knots. The BERND LEONHARDT's theory that by coming to her left the SARATOGA herself created the impression that the BERND LEONHARDT was off her starboard bow, cuts both ways: the BERND LEONHARDT's expert testified that the SARATOGA's port turn *placed* the BERND LEONHARDT on the SARATOGA's starboard bow. If this version were true, still Grope on the BERND LEONHARDT should have seen the SARATOGA's starboard light and sounded a one-blast whistle before making his turn to starboard.

Nor did the location of the SARATOGA's bridge play any part in the alleged miscalculation of her watch as to the BERND LEONHARDT's position. This court cannot find, as the BERND LEONHARDT's proctors would have it do, that her watch was so totally ignorant that it could not make allowances for possible distortion because of the position of the bridge. Neither does this court find that any alleged inexperience of the SARATOGA's navigator or other watch officers resulted in any violation of her statutory duties.

■ While there may be some conflict in the testimony as to the reason for the SARATOGA's change in course from 174° at 2348 to 190°, there is ample evidence for the court to find and it does so find that she was obligated to do so in order to open passage for a vessel passing down her port. Though neither of the radar plots picked up this vessel (it definitely was *not* the BERND LEONHARDT) three of the SARATOGA's people had established visual contact with it and stated they saw it pass down the SARATOGA's port side. The reason for the failure of radar contact may be that the set of the radar was such that if a vessel was within 2 miles of the SAR-

ATOGA it could have been missed. Good seamanship would countenance an opening, especially since it in no way would have affected and in no way did affect the SARATOGA's obligation to the BERND LEONHARDT. It is well settled that the privileged vessel discharges its responsibility if its course and speed can be readily ascertained.

The most experienced officer on the deck was the navigator who saw the BERND LEONHARDT dead ahead at about 2356. He was near the helm at 2358 when the officer of the deck ordered a course change to 160°. This order representing an analysis of the SARATOGA's duty was agreed to by the other deck officer, since the BERND LEONHARDT had refused her obligation and was making a starboard passage.

How long must the SARATOGA hold on?

Good seamanship inescapably led to the conclusion that by 2356 the BERND LEONHARDT had clearly indicated she was not going to perform her duty, but instead was seeking a starboard passage. Therefore, it was neither inexperience nor nervous vacillation on the part of the SARATOGA which caused her to keep on further to port in order to open the indicated passage. The Chicago, 125 F. 712 (2 Cir. 1903). Indeed, her watch officers in this crucial period had with fair accuracy calculated by seaman's eye and instrument the BERND LEONHARDT's range. The cases in this country are strict in requiring the holding-on vessel to maintain course and speed even after ground for serious apprehension has arisen and they have even gone so far as to exonerate a holding-on vessel for not altering her course when it subsequently appeared that collision could have been avoided if the holding-on vessel had acted. The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771 (1896); The Boston, 277 F. 36 (2 Cir. 1921); The Binghampton, 271 F. 69 (2 Cir. 1921); The Elizabeth, 1928 A.M.C. 100.

Here there was every reason for the SARATOGA to believe after the BERND LEONHARDT crossed her bow from

port to starboard that she sought a starboard passage. There were no maneuvers which indicated otherwise until the BERND LEONHARDT started her turn to starboard to re-cross the SARATOGA's bow at 2358½ which, because of her turn radius, took almost a full minute to be visible to the SARATOGA.

"When the burdened vessel is so grossly at fault as here, the law puts on her the duty of showing clearly that the other was at fault." Hand, J., in The Haida, 191 F. 623 (D.C. 1911).

"When it has become apparent that the giving-way vessel cannot or will not avoid collision, the holding-on vessel must 'take such action as will best aid to avert collision'; and will be held in fault if she fails to do so." Griffin, Crossing Courses, Chap. III, § 51 p. 155.

See The Aurania, 29 F. 98 (D.C.1886) wherein the "final obligation" rests on the privileged vessel to do what she can to avert a collision where there is a clear and manifest danger. Rule 21 imposes this obligation on the privileged vessel in the following fashion:

"When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, *she also shall take such action as will best aid to avert collision.*"

The SARATOGA was complying with her duty under this rule to avoid imminent collision by going to port.

■ Where a burdened vessel disregards its obligation to keep out of the way, no fault arises on the part of the privileged vessel for failing to hold its course and speed when that privileged vessel has kept the burdened vessel under careful observation. The watch on the SARATOGA had been careful in ascertaining the movements of the BERND LEONHARDT. Estimates of her range were accurate. Good seamanship demanded responsive action when it appeared, as it did, that the BERND LEONHARDT had crossed to starboard.

The duty officers, aware of the speed and turning capabilities of the SARATOGA, continued to open for a starboard passage and cannot be held at fault in thus meeting a dilemma caused by the BERND LEONHARDT, Wilson v. Pacific Mail S.S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899). Nor can there be fault assigned to the SARATOGA when she came hard starboard at 000½ as *in extremis* then existed.

■ When a burdened vessel places the privileged vessel in the position of making the delicate choice as to precisely when to abandon her obligations in order to avoid collision her officers cannot be held to an errorless judgment, for such a selection is made almost *in extremis,* The Queen Elizabeth, 122 F. 406 (2 Cir. 1903).

This court concludes that the SARATOGA's watch officers and crew were in no respect incompetent. It was the duty of the BERND LEONHARDT to avoid going ahead of the SARATOGA. She was bound to "if necessary, slacken her speed or stop or reverse", Rule 23. She was obliged to "keep out of the way". Instead, in the face of collision, she kept right on to cross and then, indeed, even to re-cross the SARATOGA's bow. Her several faults make any doubt as to the wisdom and good seamanship of the SARATOGA's watch officers pale by comparison. The Steel Inventor, 43 F.2d 958 (2 Cir. 1930). See particularly pages 960–961.

Nor can this court assign the SARATOGA's continuing to port from 2358 to 0000 as having contributed to the collision because until the slow change in the aspect of the BERND LEONHARDT became apparent, at almost 2359½, the SARATOGA was opening a starboard passage to avoid a collision. Here, as in Postal S.S. Corporation v. The El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335 (1939), there was an indication that the BERND LEONHARDT had not and was not going to maneuver

so as properly to discharge her primary duty to make a port passage. And, though the BERND LEONHARDT's actions were not exactly similar to the Eastern Glade's in Postal S.S. Corporation, supra, still her position across the SARATOGA's bow created a similar situation and the SARATOGA had no right to insist on holding on to the point of collision. As was said in United States v. S.S. Soya Atlantic, supra, 330 F.2d at 739:

"She ought not to continue on a collision course at undiminished speed while debating with the burdened vessel about the existence of the nature of her rights and obligations."

Adhering to this principle, the SARATOGA continued to her port.

The court finds that the SARATOGA's failure to sound her whistle could not in any way have contributed to the collision. Grope was always—on occasion, erroneously—aware, as he put it, that the BERND LEONHARDT's burden was not "heavy", a routine crossing. Any signal up to 2358 would only have called attention of the BERND LEONHARDT to her obligation to give way. Grope testified that had he heard a 2-blast signal from the SARATOGA after his first starboard turn at 2358½, he "would have turned the vessel all the way around and would have showed my tail". He further said "Because I would have been turning to the *right*, to *starboard*, I would have given one short blast". Therefore, it is clear that the BERND LEONHARDT would have taken no other action than that which she did take even had the SARATOGA sounded two blasts of her whistle.

The court finds that the SARATOGA did not violate her statutory duties and has met her burden of proving care on her own part. Jotham Shepherd v. The Schooner Clara, 102 U.S. 200, 26 L.Ed. 145 (1880), Diesel Tanker F. A. Verdon, Inc., v. Stakeboat No. 2, 340 F.2d 465 (2 Cir. 1965).

There is no clear and convincing evidence such as would require an apportionment. United States v. S.S. Soya Atlantic, supra, and cases cited therein.

CONCLUSION

The collision was caused solely and proximately by the faults and negligence of the M/V BERND LEONHARDT. All doubts as to the navigation of the USS SARATOGA must be resolved in her favor. The gross faults of the BERND LEONHARDT account for this collision.

The foregoing embodies the court's Findings of Facts and Conclusions of Law pursuant to the Rules of Practice in Admiralty and Maritime Cases, Admiralty Rule 46½. A decree fixing liability in conformity herewith may be submitted for signature.